discovery.  He continued to assert that his state and federal constitutional rights had been violated in each of these respects.

## HABEAS CLAIMS AND ARGUMENT

### I.    Standard of Review Under 28 U.S.C. §2254

As a prerequisite to obtaining habeas relief, a petitioner who is in custody pursuant to the judgment of a state court must exhaust the remedies available in the courts of that state as to each claim for relief.  *See* 28 U.S.C. 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *Barresi v. Maloney,* 296 F.3d 48, 51-52 (1st Cir. 2003).  To meet this requirement, a petitioner must show that "'he tendered his federal claim [to the state's highest court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'"  *Barresi,*  296 F.3d at 51 (quoting *Casella v. Clemons,* 207 F.3d 18, 20 (1st Cir. 2000)).  *See also Gagne v. Fair,* 835 F.2d 6, 7 (1st Cir. 1987). Here, Mr. Patnod exhausted his state court remedies by explicitly raising in the state appellate courts at least four separate federal constitutional claims:  (1) that he was deprived of his rights to due process of law, to a fair trial, and to confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by the Commonwealth's failure to disclose the existence of agreements with Ms. Chaffee and Ms. Watkins; (2) that Mr. Archibald's and Ms. Watkins' identifications of him at trial, after the police had shown Mr. Archibald a single photograph of Mr. Patnod in suggestive circumstances and both witnesses had been permitted to view him in highly suggestive circumstances at his probable cause hearing constituted "fruit of the poisonous tree," the failure to exclude which violated his rights to due process of law, to a fair trial, and to confrontation of witnesses under the Fifth, Sixth, and Fourteenth Amendment to the United States Constitution; (3) that he received ineffective assistance of counsel in pretrial proceedings

24

and at trial, in violation of his right to counsel under the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution; and (4) that the trial court's failure to order

discovery of files that could reasonably be expected to contain exculpatory evidence violated his

rights to due process of law, to a fair trial, and to confrontation of witnesses under the Fifth,

Sixth, and Fourteenth Amendments to the United States Constitution. See Petitioner's Appellate

Brief at 1-2, 22-49; Petitioner's Appellate Reply Brief at 1-14; FAR App. at 2-4, 22-35. In this

case, there is no question that Mr. Patnod's federal constitutional claims were "fairly presented"

to the state courts in a manner that would alert a reasonable jurist to the existence of these federal

questions.

Under §2254(d), the writ of habeas corpus must be granted, as to a claim that has been

adjudicated on the merits in state court proceedings, if the petitioner shows either that the

adjudication of the claim "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States," 28 U.S.C. §2254(d)(1), or that the adjudication "resulted in a decision that

was based on an unreasonable determination of the facts in light of the evidence presented in the

State court proceedings." *Id.* §2254(d)(2). Determinations of fact by a state court are presumed

correct, but the petitioner may rebut this presumption by clear and convincing evidence. *Id.*

§2254(e)(1).

**II.    THE STATE COURTS' FAILURE TO FIND THAT AN AGREEMENT EXISTED
BETWEEN  THE COMMONWEALTH AND MS. CHAFFEE, TOGETHER
WITH THE STATE COURTS' REFUSAL TO ORDER A NEW TRIAL BASED
ON THE COMMONWEALTH'S FAILURE TO DISCLOSE THAT MATERIAL
EXCULPATORY EVIDENCE TO MR. PATNOD, IS CONSTITUTIONAL
ERROR THAT DEPRIVED MR. PATNOD OF HIS RIGHT TO DUE PROCESS
OF LAW, TO A FAIR TRIAL, AND TO CONFRONTATION OF WITNESSES,
ALL IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH
<u>AMENDMENTS TO THE UNITED STATES CONSTITUTION.</u>**

## A.    <u>Constitutional Standard</u>

The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution require the state in a criminal case to disclose all material exculpatory evidence in its possession. *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *United States v. Agurs,* 427 U.S. 97 (1976); *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Such evidence includes any information that might be used to impeach the government's witnesses by showing the witness's bias or interest. *United States v. Bagley*, 473 U.S. 667, 676-677 (1985); *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir. 1982). It is well established that any understandings, agreements, promises, inducements, or similar arrangements between the government and a prosecution witness constitute exculpatory evidence that must be disclosed to the defendant before trial. *Giglio*, 405 U.S. at 154-55; *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Gilday v. Callahan*, 59 F.3d 257, 267-269 (1st Cir. 1995), *cert. denied*, 516 U.S. 1175 (1996); *United States v. Buendo*, 701 F. Supp. 937, 940 (D. Mass. 1988); *United States v. Lynn*, 856 F.2d 430, 432-433 (1st Cir. 1988). In order to trigger this obligation, an agreement need not be explicit or definite; the prosecution must disclose all promises or understandings, even if vague or imprecise. *See Gilday*, 59 F.3d at 269 ("'wink and nod' deal"); *Ely v. Matesanz*, 983 F. Supp. 21, 39 (D. Mass. 1997) ("assurances" that "something can and will be worked out"). A defendant has a constitutional right to cross-examine regarding such agreements, *Brady*, 373 U.S. 83, which can provide powerful evidence of bias due to the witness's motivation to seek favor with the government.

Where the government wrongfully withholds exculpatory evidence, the failure to disclose will be considered material if there is "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514

U.S. at 433 (quoting *Bagley*, 473 U.S. at 682). If the previously undisclosed evidence reveals

that the prosecutor knowingly used false testimony or knowingly failed to disclose that testimony

used to convict a defendant was false, however, a more lenient standard applies: the failure to

disclose will be considered material if there is "any reasonable likelihood that the false testimony

could have affected the judgment of the jury." *Agurs*, 427 U.S. at 103; *Gilday*, 59 F.3d at 267.

**B.    Agreement between the Commonwealth and Susan Chaffee**

In Mr. Patnod's case, the trial court and the Massachusetts Appeals Court ignored clear

and convincing evidence that an agreement existed between the Commonwealth and Ms.

Chaffee, whereby the Commonwealth agreed to engineer a lenient disposition of her drug

charges in exchange for her testimony at Mr. Patnod's trial. Five witnesses testified on the

subject, at the hearing on the motion for new trial. Mr. Patnod's witnesses, Ms. Scozzafava and

Mr. Chaffee, testified that there was a deal, while the Commonwealth's witnesses, Ms. Chaffee,

Mr. Progen, and Mr. Landry, said that there was not. The motion judge failed to acknowledge the

fact that neither of Mr. Patnod's witnesses had any motive to lie about the existence of an

understanding, while the Commonwealth's witnesses did. Ms. Scozzafava, in particular, knew

nothing about Mr. Patnod's case, and had never seen him before the day of the motion hearing.

N.Tr.I, 40-41, 59. Ms. Scozzafava is an attorney who, at the time of the motion hearing, had been

practicing for more than ten years. *Id.* at 9. She appeared as an officer of the court, recounting her

clear memory of the understanding between herself and the Commonwealth regarding Ms. Chaffee.

Even though the benefit that Ms. Chaffee was to receive may not have been well-defined, Ms.

Scozzafava testified that there was a definite understanding as to a *quid pro quo*: if Ms. Chaffee

testified at Mr. Patnod's trial, "something favorable" would happen with regard to her sentence, *id.*

at 26, 86, and it would happen by means of a motion to revise and revoke. *Id.* at 27-29, 51, 56-58,

27

60, 66, 74, 86-87. Ms. Scozzafava also testified to the Commonwealth's orchestration of the reward: the Commonwealth advised her on the timing of the motion to revise and revoke; voluntarily obtained an extension of Ms. Chaffee's stay; recommended probation instead of the substantial committed sentence; and carried the laboring oar at argument of the motion. *Id.* at 30-38.

Ms. Scozzafava's testimony about the existence of an agreement is of central importance. Nowhere in his decision, however, did the motion judge consider her testimony directly. Instead, he appears to overlook it. He stated, for instance, that "[t]here was nothing said by the Commonwealth's representatives that could form the basis of any implication of agreement," A. 525, when Ms. Scozzafava testified to communications with Mr. Progen that created just such an implication. N.Tr.I, 23-27, 51, 56-58, 65-66, 86-87. The judge failed to acknowledge Ms. Scozzafava's testimony that, together with the motion to revise and revoke, she filed her affidavit, which refers to Mr. Progen's instruction to file the motion, *id.* at 32-33, A. 417; he failed to acknowledge the affidavit's inexplicable absence from the court's file. The judge pointed to the fact that Ms. Scozzafava told Ms. Chaffee to be prepared to begin incarceration immediately after the January 8, 1991 hearing, A. 527, but did not mention Ms. Scozzafava's testimony that this was because, until her January 7 conversation with Mr. Landry, she expected a reduction rather than total suspension of the sentence. N.Tr.I, 36-37, 51, 56-57, 60, 74.

Ms. Scozzafava's testimony was important enough that it deserved to be discussed directly; if the judge disbelieved her, he should have explained why. Instead of an explanation, however, the decision provided only the summary statement that "[t]o the extent that any other witness testified that there was any expectation of favorable treatment of Chaffee in her case as a result of her testimony against Patnod, they are disbelieved." A. 526.

28

The opinion failed to acknowledge other important evidence in the record. The judge twice states that Mr. Landry had no discussions with Ms. Scozzafava about Ms. Chaffee prior to her testimony in Mr. Patnod's case, A. 524, 525, when in fact Mr. Landry testified that he believed he and Ms. Scozzafava had had such a discussion. N.Tr.II, 129-30, 166-67. There is also no dispute that Mr. Landry had several discussions directly with Ms. Chaffee. *Id.* at 37-38, 62, 150-55. The judge pointed to Ms. Chaffee's having identified Mr. Patnod in speaking with the police a week after the incident;[10] however, Ms. Chaffee did not testify before the grand jury, at the probable cause hearing, or at the suppression hearing, Tr. 246, and did not want to testify at Mr. Patnod's trial. N.Tr.II, 7, 37, 155. While Mr. Landry could have obtained her trial testimony by subpoena, any prosecutor would prefer a willing witness to an unpredictable and reluctant one. The fact that Ms. Chaffee had disposed of her own case before Mr. Patnod's trial began could, if anything, be expected to give her even less incentive to testify—unless, as Ms. Scozzafava stated, Ms. Chaffee knew that she could improve her own circumstances by her testimony.

The motion judge also ignored other salient evidence. The drastic reduction in Ms. Chaffee's sentence itself points to the existence of an agreement. *See, e.g., Commonwealth v. Hill*, 432 Mass. 704, 712 (2000)(where trafficking charge carrying mandatory minimum sentence was reduced and witness received only a 2-1/2 year sentence to house of correction, this "strongly supports the existence of an agreement between [that witness] and the Commonwealth"); *Commonwealth v. Johnson*, 21 Mass. App. Ct. 28, 40-41 (1985)("even if words of promise were not used," circumstantial evidence, "not least of which consisted of the actual outcome" of pending charges, established existence of agreement). It is undisputed that the reduction in

---

[10]  She did so only after she called the police to find out more about Mr. Chaffee's case, and after they told her that he "had been identified as the other man with Mark Patnod and was in serious trouble." Tr. 244-45.

29

sentence that Ms. Chaffee received—originally six to ten years committed, reduced to a mere two

years' probation—was highly unusual. N.Tr.II, 110, 178. The original school zone charge carried a

mandatory minimum, not subject to alteration on a motion to revise and revoke; the

Commonwealth's agreement, the day before Mr. Patnod's trial, to drop that charge made possible

the later revision (after his trial but, as the Commonwealth apparently felt when it cautioned Ms.

Scozzafava about the filing of the motion, not too soon after it) of her sentence to probation. It is

also undisputed that, in Ms. Chaffee's case, the District Attorney's office did not follow its usual

practice of deferring either her plea or sentencing until after she had testified. Instead, it acted more

perniciously. It created the false impression that Ms. Chaffee's case had been entirely disposed

of, and that she had no incentive to try to please the Commonwealth with her testimony against

Mr. Patnod, when in fact the opposite was the case.

   The motion judge found the stay legitimate, stating that it was done because Ms.

Chaffee's son was ill, because she wanted to arrange his temporary custody during her

imprisonment, and because she wanted to be home for his first Christmas. A. 524. Yet none of

these reasons were stated on the record at the time, *see* A. 430-31, and Ms. Chaffee herself

testified that she had requested only a week's stay to arrange child care, not the month that she

received. N.Tr.II, 20.

   The motion judge placed great weight on the Commonwealth's invocation of alleged safety

concerns to justify the suspension of Ms. Chaffee's sentence, finding such concern "reasonable." A.

526. This concern, however, was known to the Commonwealth and expressed to the Court at the

time of Ms. Chaffee's original sentencing. *Compare* A. 429-30 *with* A. 439-41. Little or nothing

had changed, with regard to Ms. Chaffee's safety, between the date of her sentencing and the date

of the hearing on her motion to revise and revoke. What had changed was that she had helped

30

the Commonwealth with her testimony at Mr. Patnod's trial. Mr. Landry insinuated that Mr. Patnod posed a threat to Ms. Chaffee, without citing any actual evidence to that effect, and without ever explaining how Mr. Patnod, who was starting a very long sentence at MCI Cedar Junction, could harm Ms. Chaffee if she were to be incarcerated at a separate women's prison or at an out-of-state placement, any more than if she were out on the street. A. 439-40; *see also* N.Tr.II, 176-77. It is noteworthy that Ms. Chaffee herself never expressed any fear of Mr. Patnod to her attorney, *id.* at 22, nor did she identify safety concerns as a reason for wanting a stay, *id.* at 20-21, 49-50, nor did Mr. Progen necessarily agree that safety concerns warranted complete suspension of her sentence. *See id.* at 97-98. The safety concerns, if any, with regard to Ms. Chaffee were no different from those facing any witness-defendant who testifies against another defendant in a case involving a violent crime—most of whom do not receive dramatic sentence reductions as a result. *See id.* at 177-78.

The motion judge also failed to acknowledge the testimony of Gary Chaffee, who stated that Ms. Chaffee had told him, after Mr. Patnod's conviction, that she had never been sure whether it was Mark or Dwayne Patnod outside their window on the night of the crime, but that she had testified that it was Mark on the understanding that she would thereby avoid prison. N.Tr.I, 99-105; A. 326-27. Mr. Chaffee, like Ms. Scozzafava, had no discernible motive to lie about Ms. Chaffee's case. Ms. Chaffee and the prosecutors, on the other hand, would have every reason to want to conceal the existence of their agreement.

The Massachusetts Appeals Court, in affirming the trial court's decision on the motion for new trial, also overlooked the clear and convincing evidence of an agreement between the Commonwealth and Ms. Chaffee. The Appeals Court, like the trial court, gave short shrift to Ms. Scozzafava's testimony. Despite the importance of her testimony, the Appeals Court alluded

31

to it only in a brief footnote (n.8), stating that Ms. Scozzafava testified that she had been "'led to believe' that there was some type of an agreement between Susan Chaffee and the Commonwealth in exchange for her testimony against the defendant." This mischaracterizes Ms. Scozzafava's testimony, however. What she actually stated was that, based on her plea negotiations with the District Attorney's office on Ms. Chaffee's behalf, she was led to believe that something favorable would happen with regard to Ms. Chaffee's sentence if Ms. Chaffee testified against Mr. Patnod, and that it would happen by means of a hearing on a motion to revise and revoke after Ms. Chaffee's testimony in his case. N. Tr.I, 24-27, 51, 56-58, 86-87. In other words, Ms. Scozzafava was not "led to believe" that there was an agreement; rather, what she was "led to believe" constituted part of the agreement.

The Massachusetts Appeals Court also stated (n.9) that there was "no evidence of an express agreement" between the Commonwealth and Ms. Chaffee. In fact, however, there was ample evidence, both from Ms. Scozzafava's testimony and from Gary Chaffee's, that an express agreement (a quid pro quo) existed, even though not all terms of the agreement were definite. *See, e.g.,* N.Tr. I, 23-29, 51, 56-58, 65-66, 86-87, 99-100, 102-05, 120. Ms. Scozzafava certainly understood that something favorable would happen with regard to Ms. Chaffee's sentence if she testified, although she did not know in advance exactly how favorable the treatment would be. *E.g., id.* at 26-28, 50-51. The Appeals Court, like the trial court, ignored the drastic reduction of Ms. Chaffee's sentence, which in and of itself provides powerful evidence of an agreement.

Moreover, both the motion judge and the Appeals Court appeared to base their decisions at least in part on the fact that Ms. Scozzafava and Ms. Chaffee did not know in advance just how favorable Ms. Chaffee's treatment, in exchange for her testimony against Mr. Patnod, might be. Appeals Court Memorandum Opinion n.9; A. 527. The trial court and Appeals Court appeared to

believe that, because this term of the agreement was not precisely defined, no agreement existed. As discussed above, however, that even a vague or imprecise understanding with a witness is enough to trigger the Commonwealth's obligation under the federal constitution to disclose that understanding. *See Gilday*, 59 F.3d at 269; *Ely*, 983 F. Supp. at 39

The Appeals Court also ignored the Commonwealth's orchestration of the events surrounding Ms. Chaffee's motion to revise and revoke, as well as the pretextual nature of the "safety" concerns that the Commonwealth advanced to justify Ms. Chaffee's suspended sentence. *See* Petitioner's Appellate Brief at 28-30; Petitioner's Appellate Reply Brief at 4, 10.

For all of the foregoing reasons, clear and convincing evidence shows that an agreement existed between Ms. Chaffee and the Commonwealth, which the Commonwealth was obliged to disclose to Mr. Patnod before his trial. The failure to disclose the agreement was constitutional error. *See, e.g., Kyles*, 514 U.S. at 437-38; *Giglio*, 405 U.S. at 154-55; *Pointer*, 380 U.S. at 406 (1965); *Brady*, 373 U.S. at 87. In this case, that error was compounded both by the prosecutor's knowing failure to correct the false impression created by her testimony at Mr. Patnod's trial and by the prosecutor's deliberate exploitation of her testimony in his closing. *See* Tr. 174, 359-60. The government is required immediately to correct false or misleading testimony by one of its witnesses, when the prosecutor knows or has reason to know of its falsehood. *Giglio*, 405 U.S. 150; *Napue*, 360 U.S. at 269. As soon as Ms. Chaffee testified that no promises had been made to her, Mr. Landry was bound to reveal to the court and jury the existence of the outstanding arrangement. *See Ely*, 983 F. Supp. at 39, 41-42. He failed to do so. By remaining silent, Mr. Landry deprived the jury of the opportunity to assess Ms. Chaffee's credibility based on a complete knowledge of all the facts; "in effect, [he] usurped its role as factfinder with respect to

33

[her] credibility." *Ely*, 983 F. Supp. at 42.[11]

Because the prosecutor knowingly used Ms. Chaffee's false testimony in Mr. Patnod's

case, the more lenient standard articulated in *Kyles, Agurs,* and *Bagley* (whether there is any

reasonable likelihood that the false testimony could have affected the jury's judgment) applies.

There is no question that Ms. Chaffee's testimony could have affected the jury's judgment in this

case. Even assuming *arguendo* that the alternative standard (whether the result of the proceeding

would have been different if the exculpatory evidence had been disclosed) were applicable, the

error rises to that level as well.  The case turned on eyewitness identification. Three of the

witnesses at Mr. Patnod's trial (Ms. Chaffee, Mr. Archibald, and Ms. Watkins) placed Mr.

Patnod at or near the scene of the crime. Three others (Mr. Chaffee, Ms. Weeks, and Mr. Weeks)

testified that he was not there.[12]  Mr. Archibald and Ms. Watkins were vulnerable on cross-

examination, because each had initially identified Dwayne Patnod as the perpetrator, and had

given a description that matched Dwayne rather than Mark.  Ms. Chaffee's identification of Mr.

Patnod was bound to carry weight with the jury, because she was the only prosecution witness

who knew both Dwayne and Mark Patnod. Mr. Landry himself acknowledged that Ms.

Chaffee's testimony, which he initially viewed as "significant" because she knew Mr. Patnod and

could identify him at a "crucial time," N.Tr.II, 133, became "even more significant" after Gary

Chaffee's decision to testify.  *Id.* at 134.  The jurors, in weighing all of the identification

testimony and particularly that of the two Chaffees, might well ask why Ms. Chaffee would come

---

[11]  The timing of the misrepresentation, occurring in the closing when it was one of the last statements that the jury heard, magnified its impact.  *See Commonwealth v. Collins*, 386 Mass. 1, 15 n.14 (1982).

[12]  The partial, smudged fingerprint taken from the cab (a public conveyance) is the sole piece of physical evidence suggesting a link between Mr. Patnod and the crime.  Even assuming *arguendo* that Officer Ryan accurately identified the fingerprint, however, the Commonwealth would have needed to show beyond a reasonable doubt that the fingerprint had been placed on the cab during the commission

34

forward with testimony directly opposite to that of her husband, and perhaps adverse to her husband's interests, except from an overwhelming desire to do her duty as a citizen and to tell the truth about what she had seen.

The Commonwealth's failure to disclose its agreement with Ms. Chaffee deprived both Mr. Patnod and the jury of a major source of impeachment of an important witness. The fact that Ms. Chaffee "had an offer of leniency, and, even more important, one that was in abeyance, was a circumstance which could lead the jury to the conclusion that the witness had reason to seek favor with the government by [her] testimony," *Commonwealth v. Collins*, 386 Mass. 1, 10 (1982), and which, if disclosed, could therefore have led the jury to discredit her testimony. Just as important, "the very fact that [Ms. Chaffee] had attempted to give the jury a false impression" about her arrangement with the Commonwealth, had it been revealed, would have given the jurors a "persuasive reason to doubt" her overall credibility. *United States v. Barham*, 595 F.2d 231, 243 (5th Cir. 1979). Here, "use of the agreement for impeachment would have been doubly effective, because it would have shown not only that [Ms. Chaffee] had lied when [she] denied that the agreement existed, but that [she] also had (and, worse, tried to conceal) a motive to lie about [Mr. Patnod's] guilt." *Ely*, 983 F. Supp. at 37. As it was, however, the jury was deprived of this important evidence. Once Mr. Mancuso decided to question Ms. Chaffee about the existence of an agreement, the defense faced "a worst case scenario[, which] permitted [her] to give unrefuted and unrefutable testimony that 'no agreement was made,' and it gave [Mr. Landry] the opening he needed to argue in his closing that [she] had no reason to lie about [Mr. Patnod's] guilt." *Id.* at 38.

---

of the crime. *Commonwealth v. Morris*, 422 Mass. 254, 257 (1996); *Commonwealth v. LaCorte*, 373 Mass. 700, 703 (1977).

For all of the foregoing reasons, Mr. Patnod has shown by clear and convincing evidence that the state courts' factual determinations were wrong, and that an agreement or understanding did exist between the Commonwealth and Ms. Chaffee. That being so, the Commonwealth's failure to disclose the existence of that agreement to Mr. Patnod before his trial violated his rights to due process, a fair trial, and confrontation of witnesses guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. The Commonwealth's agreement with Ms. Chaffee constituted material evidence, and the failure to disclose it was not harmless error, under either of the *Kyles/ Agurs/Bagley* standards. Thus, the decisions of the state courts were contrary to, or involved an unreasonable application of, the clearly established Supreme Court law requiring disclosure of exculpatory evidence, and the adjudications resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Pursuant to 28 U.S.C. §2254, the writ of habeas corpus should issue.

**B.      Agreement Between the Commonwealth and Sheryl Watkins**

The state courts also ignored clear and convincing evidence of the existence of an agreement between the Commonwealth and Sheryl Watkins. At the hearing on his motion for new trial, Mr. Patnod presented the testimony of Dwayne Burrell, who stated that Ms. Watkins had told him that she entered into a deal with the Commonwealth, whereby charges pending against her were dropped in exchange for her identification of Mr. Patnod at his trial. N.Tr.I, 148-51. The Commonwealth did not call Ms. Watkins to rebut his testimony, and Mr. Landry, when asked, said only that he "did not recall" offering her consideration in exchange for her testimony. N.Tr.II, 149. In light of this evidence, the motion judge's finding that no agreement existed was unsupported and therefore unreasonable. The Massachusetts Appeals Court

unreasonably upheld this finding. Its opinion shows that it misconstrued the facts, as the court

stated that Ms. Watkins testified at the hearing on the motion for new trial, when in fact she did

not. Mem. Op. at 2, 2003 WL 549058 at ***1.

The principles discussed in the preceding section with regard to Ms. Chaffee apply as

well to the Commonwealth's undisclosed agreement with Ms. Watkins. By failing to disclose

that agreement, the Commonwealth Mr. Patnod's rights to due process, a fair trial, and

confrontation of witnesses under the Fifth, Sixth and Fourteenth Amendments to the United

States Constitution. The failure to disclose was not harmless. Ms. Watkins was an eyewitness to

the crime, who had no discernible motive to implicate Mr. Patnod. Particularly if the

Commonwealth's agreement with her had been disclosed in conjunction with the

Commonwealth's agreement with Ms. Chaffee, the result in Mr. Patnod's case could and would

have been different. Mr. Patnod has satisfied §2254 with regard to the Watkins agreement as

well.

**III.     THE STATE COURTS' FAILURE TO FIND THAT MR. ARCHIBALD'S AND
        MS. WATKINS' IN-COURT IDENTIFICATIONS OF MR. PATNOD WERE
        IMPERMISSIBLY TAINTED DEPRIVED MR. PATNOD OF HIS RIGHT TO
        DUE PROCESS OF LAW, TO A FAIR TRIAL, AND TO CONFRONTATION OF
        WITNESSES, ALL IN VIOLATION OF THE FIFTH, SIXTH, AND
        FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The manner in which identification procedures were carried out in Mr. Patnod's case was

so prejudicial as to violate Mr. Patnod's rights to due process of law and to a fair trial under the

Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The unfair and

prejudicial identification procedures involved, first, the suggestive display of a single photograph

of Mr. Patnod to Mr. Archibald by the police, and second, the prejudicial circumstances under

which Mr. Archibald and Ms. Watkins viewed Mr. Patnod at the probable cause hearing, seeing

him in restraints and prison garb and hearing him identified by name as the defendant. These had

37

the effect of denying Mr. Patnod a fair trial and due process of law and preventing him from

effectively confronting and cross-examining Commonwealth witnesses. *See, e.g., Estelle v.*

*Williams*, 425 U.S. 501, 503 (1976); *Davis v. Alaska*, 415 U.S. 308, 315-317 (1974); *Washington*

*v. Texas*, 388 U.S. 14, 19 (1967).

        The trial court, on the motion to suppress preceding Mr. Patnod's trial, erroneously

concluded that Mr. Archibald and Ms. Watkins each had an independent basis for their

identifications of Mr. Patnod. The judge on the motion for new trial and the Massachusetts

Appeals Court also erred in declining to disturb that conclusion.

        At Mr. Patnod's suppression hearing, the judge concluded that all of Mr. Archibald's and

Ms. Watkins' identifications, except the one that Mr. Archibald made from the suggestively-

displayed single photograph, were based on observations made on the night in question. M.Tr.

105. The Court's independent source analysis (M.Tr. 92-106) is unreasonable, however. The

judge ignored the facts that Mr. Archibald's initial description of the perpetrator matched Dwayne

Patnod's appearance; that it did not match Mark's; that Mr. Archibald identified Dwayne from a

photo array shown to him within twenty-four hours after the crime; that he passed over a

photograph of Mark shown to him at the same time; and that Ms. Watkins likewise identified

Dwayne's photograph. Moreover, the judge's conclusion was based in part on an improper

physiognomic disquisition of his own: he opined that the "bone structure" of Mark's and

Dwayne's faces, the shapes of their heads and noses, and the quality of their eyes were

"remarkably similar," M.Tr. 104, when there was no showing that the judge was an expert in this

subject, or that it was a matter of which he could take judicial notice. In fact, a person examining

both photographs could come to the opposite conclusion. *See* A. 141.[13]

In his decision on the motion to suppress, the judge stated that all of Mr. Archibald's

identifications of Mr. Patnod, except the one from the single photograph, "appear to me to be

based entirely on the observations made on the night in question. The taxicab driver had ample

opportunities, and the circumstances were such as to provide him with good circumstances under

which to take note of the defendant's appearance." M.Tr. 105. This analysis might hold up *if* Mr.

Archibald's description of the perpetrator had matched Mark Patnod's (instead of Dwayne

Patnod's) appearance, and *if* Mr. Archibald had identified Mark Patnod (instead of Dwayne) from

the photo array shown to him within twenty-four hours after the crime. In the circumstances,

however, the Court's conclusion is not supportable. Mr. Archibald did not identify Mr. Patnod

until *after* he viewed the suggestive single photograph. Similarly, Ms. Watkins did not identify

Mr. Patnod until after she had seen him in prison garb and restraints at the probable cause

hearing, and after the police spoke with her about her failure to identify him correctly even then.

All identifications of Mr. Patnod by Mr. Archibald after the suggestive showing of the single

photograph, as well as all identifications by Mr. Archibald and Ms. Watkins after the suggestive

circumstances of the probable cause hearing, constitute the "fruit of the poisonous tree," tainted

by the occurrences that preceded them. The subsequent identifications should have been

excluded. The result of Mr. Patnod's trial could and would have been different if that had

occurred.

---

[13] Reproduced in the cited pages of the Appendix to Mr. Patnod's Massachusetts Appeals Court brief are three trial exhibits: the arrays in which Dwayne's (A. 129-34) and Mark's (A. 135-39) photographs appeared (Dwayne's is at A. 135 and Mark's is on the right at A. 139), Tr. 181-82, as well as the single photograph of Mark Patnod taken upon his arrest (A. 140, Tr. 192-93). For the court's convenience, somewhat clearer copies of the array photographs of Dwayne and Mark were also included (A. 141).

As the United States Supreme Court has stated, "[T]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 222 (1967). Indeed, "mistaken identification is believed widely to be the primary cause of erroneous convictions." *Commonwealth v. Johnson*, 420 Mass. 458, 465 (1995)(citing authorities). This is particularly true where, as with Mr. Archibald and Ms. Watkins, the witness and the defendant are strangers to each other. *Commonwealth v. Jones*, 423 Mass. 99, 109 (1996). The state courts' decisions allowing and then upholding the admission of the subsequent identification evidence were contrary to, or involved an unreasonable application of, clearly established constitutional principles requiring a fair trial, due process of law, and a right to confrontation of witnesses, and the state court adjudications resulted in decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Pursuant to 28 U.S.C. §2254, the writ of habeas corpus should issue on this basis as well as those discussed above.

## IV.    THE STATE COURTS' FAILURE TO FIND THAT MR. PATNOD RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL DURING PRETRIAL PROCEEDINGS AND AT TRIAL DEPRIVED MR. PATNOD OF HIS RIGHT TO DUE PROCESS OF LAW, TO A FAIR TRIAL, AND TO CONFRONTATION OF WITNESSES, ALL IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

In order to show ineffective assistance of counsel, a defendant must show "both incompetence and prejudice." *Kimmelman v.* Morrison, 477 U.S. 365, 381 (1986). That is, he must show that "counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy," *id.,* and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). In this case,

40

the conduct of Mr. Patnod's attorneys at the probable cause hearing and at trial fell well below prevailing norms. Their actions were not sound strategy and it is reasonably probable that, but for their errors, the result of Mr. Patnod's proceedings would have been different. The ineffective assistance of counsel violated Mr. Patnod's rights under the Sixth and Fourteenth Amendments to the United States Constitution.

Mr. Patnod's counsel at the probable cause hearing, Herbert Bober, erred by failing to take steps to prevent the witnesses from seeing Mr. Patnod in suggestive circumstances (being led right past the witnesses wearing leg irons, shackles, and prison garb; sitting alone at counsel table with his attorney; being identified by name before the witnesses were sequestered). Mr. Bober erred in failing to request safeguards, such as that Mr. Patnod be seated among a large audience in ordinary attire, or presented to the witnesses in a formal or informal in-court lineup. *Cf. United States v. Brien*, 59 F.3d 274, 278-79 (1st Cir. 1995).

Mr. Patnod's trial counsel, Leonard Mancuso, failed to provide effective assistance in a number of ways. First, although the Commonwealth agreed to disclose the criminal records of its witnesses, A. 2, he failed to obtain those records. A. 335; *see* A. 339. He thereby foreclosed an entire line of cross-examination, of particular relevance given that the Commonwealth later impeached all of the defense witnesses with their criminal records. Tr. 259, 281, 323-25.

Second, Mr. Mancuso failed to obtain Mr. Archibald's medical records or otherwise to develop the facts regarding Mr. Archibald's manic-depressive illness and medication. Mr. Archibald's trial testimony contradicted his earlier testimony as to the nature of his illness and as to whether he had taken his medications, Navane and lithium, on December 15, 1989. *Compare* A. 231-39 *with* Tr. 90-91, 136. Lacking expert evidence, Mr. Mancuso was not able to explore the effects of Mr. Archibald's mental the illness and of the medications (or lack thereof) on his

41

ability to perceive, his memory, and his suggestibility. A. 335. *See Strickland*, 466 U.S. at 691

(counsel's duty to make reasonable investigations); *Commonwealth v. Farley*, 432 Mass. 153

(2000)(failure to investigate and develop evidence that could have raised reasonable doubt in

juror's minds).

Third, Mr. Mancuso failed to make any attempt to compel Dwayne Patnod to appear at

trial. A. 330, 335-36. Although Dwayne could have refused to testify, his physical appearance

would have helped Mr. Patnod's case; his failure to appear would also have been significant.

Fourth, Mr. Mancuso failed to obtain an official transcript of the probable cause hearing.

A. 330, 335; *See* Tr. 152-55. Although he could have played the audiotape, Tr. 155-56, the lack

of an official transcript evidently chilled his efforts to impeach the Commonwealth's witnesses.

Tr. 152-55. *See Nixon v. Newsome*, 888 F.2d 112, 116 (11th Cir. 1989); *Blackburn v. Foltz*, 828

F.2d 1177, 1183-84 (6th Cir. 1987), *cert. denied*, 485 U.S. 970 (1988).

Fifth, Mr. Mancuso failed to seek a required finding of not guilty. *See* Tr. 257-58, 329,

334.

Lastly, Mr. Mancuso failed to object to unsupported assertions that the prosecutor made

about Ms. Weeks and Mr. Chaffee during his closing, and to his unfair cross-examination of Mr.

Chaffee. Tr. 352-55; *supra* at 40-41. Mr. Landry stated, without any support in the record, that

one of Mr. Patnod's alibi witnesses, Ms. Weeks, had visited Mr. Patnod in prison before trial.

Tr. 352-53. He thus implied that the two were close friends, instead of the casual acquaintances

that they were, and implied that they had met to fabricate an alibi, when in fact she testified that

she had only glimpsed him in passing while visiting someone else, and had not spoken to him on

that occasion or at any time after December 15, 1989. *See* Tr. 268, 272, 278-79. Mr. Landry also

committed misconduct, both in cross-examination and in closing, when he attempted to discredit

42

Mr. Chaffee by implying that Mr. Patnod had threatened him, and that Mr. Chaffee had testified

as he did because he feared Mr. Patnod. Tr. 313-15, 323, 354-55. These implications too were

entirely unsupported by the evidence, and Mr. Mancuso failed to object to them.

      The judge's opinion on the motion for new trial minimized the attorneys' errors,

concluding that those errors did not amount to ineffective assistance. A. 529-532. The

Massachusetts Appeals Court upheld the motion judge's determination with little discussion.

Memorandum Opinion, 2003 WL 549058 at ***4. There was a reasonable probability, however,

that, but for the cumulative effect of these errors, the result of Mr. Patnod's proceedings would

have been different. Mr. Patnod was denied the effective assistance of counsel, in violation of

his rights under the Sixth and Fourteenth Amendments to the United States Constitution. The

state courts' decisions were contrary to, or involved an unreasonable application of, clearly

established Supreme Court law regarding the right to effective assistance of counsel in criminal

cases, and the state court adjudications resulted in decisions that were based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings. Mr.

Patnod has satisfied the requirements of 28 U.S.C. §2254 as to this ground as well as those

discussed above.

**V.**     **THE STATE COURTS' FAILURE TO REQUIRE THE COMMONWEALTH TO PERMIT DISCOVERY OF ITS FILES IN MR. PATNOD'S, MS. CHAFFEE'S, AND MR. GALLANT'S CASES DEPRIVED MR. PATNOD OF HIS RIGHT TO DUE PROCESS OF LAW, TO A FAIR TRIAL, AND TO CONFRONTATION OF WITNESSES, ALL IN VIOLATION OF THE FIFTH, SIXTH, AND <u>FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.</u>**

      As discussed above, Mr. Patnod has a right, under the Fifth, Sixth, and Fourteenth

Amendments to the United States Constitution, to obtain exculpatory evidence. *E.g., Brady v.*

*Maryland,* 373 U.S. 83 (1963). Once Mr. Patnod learned of evidence pointing toward the

existence of an agreement between the Commonwealth and Ms. Chaffee, he sought to obtain

further evidence by seeking discovery of Ms. Chaffee's criminal file, as well as his own file and that of Ms. Chaffee's co-defendant, Roland Gallant, during post-trial proceedings. He argued that those files could be expected to contain evidence relevant to the existence of an agreement between Ms. Chaffee and the Commonwealth. Here, in light of the facts that the Commonwealth had access to the CPCS' file in Ms. Chaffee's case, A. 414a; that there was no law enforcement reason to shield her file or Mr. Gallant's from disclosure, years after their offenses; that Mr. Landry's memory was vague on significant matters including his conversations with Ms. Scozzafava and Ms. Chaffee before and after Mr. Patnod's trial; that no absolute privilege protects the files from disclosure; and that the files could be protected by *in camera* review, the trial court should have permitted Mr. Patnod to obtain them. Denial of access to this material violated Mr. Patnod's constitutional rights to a fair trial, due process of law, and a right to confrontation of witnesses. Particularly in conjunction with the other violations of his rights discussed above, the failure to allow Mr. Patnod to obtain this evidence provides a further basis for the granting of the writ of habeas corpus.

## CONCLUSION

For the reasons discussed above, the Court should order that the writ of habeas corpus issue, that Mr. Patnod's convictions be vacated, and such other and further relief as may be appropriate.

44

Respectfully submitted,

MARK J. PATNOD

By his attorneys,

/s/ *Eileen M. Hagerty*

Eileen M. Hagerty  (#216490)
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, Massachusetts 02114
(617) 227-7031

Dated:  August 18, 2006

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused a copy of the foregoing document to be served by first class mail, postage prepaid, and by electronic mail, on Annette C. Benedetto, Assistant Attorney General, One Ashburton Place, Boston, Massachusetts 02108, attorney for the respondent.

/s/ *Eileen M. Hagerty*

Eileen M. Hagerty

Dated:  August 18, 2006