## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| **MARK  J. PATNOD,** ) | |
|   **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 04-10865-GAO** |
| ) | |
| **DAVID NOLAN,** ) | |
|   **Respondent.** ) | |
| _____) | |

## MEMORANDUM OF THE RESPONDENT IN OPPOSITION
## TO THE PETITION FOR WRIT OF HABEAS CORPUS

The respondent submits this memorandum in opposition to the petition for writ of habeas corpus filed by Mark J. Patnod ("the petitioner") who was convicted in 1990 of armed robbery and assault to murder while armed with a dangerous weapon in connection with the abduction, robbery and stabbing of a taxi cab driver in Worcester, Massachusetts.

The petitioner bases his application for federal habeas relief on four grounds:

_____**Ground One**: Conviction obtained by the unconstitutional failure of the prosecution to disclose to the petitioner evidence favorable to him (agreements between the Commonwealth and two prosecution witnesses) violating his rights to due process, a fair trial and confrontation and cross-examination of witnesses guaranteed by the 5th, 6th and 14th amendments.  (Petition, p. 5, ¶ 12A)

_____**Ground Two**: Conviction obtained by unconstitutional identification procedures violating petitioner's rights to due process, fair trial and confrontation and cross-examination under 5th, 6th and 14th amendments.  (Petition, p. 5, ¶ 12B)

**Ground Three**: Denial of effective assistance of counsel in violation of the petitioner's rights under the Sixth and Fourteenth Amendments to the U.S. Constitution. (Petition, p. 6, ¶ 12C)

_____**Ground Four**: denial of access to materials sought in post-trial discovery (Commonwealth's files regarding the criminal charges against Ms. Chaffee and her co-defendant Rolland Gallant relevant to Ground One) in violation of petitioner's rights to fair trial, due process and confrontation and cross-examination of witnesses under the 5th, 6th and 14th amendments.  (Petition, p. 6, ¶ 12D)

2

It is the respondent's position that the petition should be denied for the reasons cited below. Regarding Ground One, the state court's findings of fact that there were no agreements between the Commonwealth and two prosecution witnesses is presumptively correct and the petitioner has not supplied clear and convincing evidence to rebut the presumption. The adjudication of the Massachusetts Appeals Court rejecting Grounds One, Two and Three is not contrary to or an unreasonable application of clearly established Supreme Court law. Also, the issue presented in Ground Four is one of state law inappropriate for federal habeas review.

## PRIOR PROCEEDINGS

On April 12, 1990, the Worcester County Grand Jury returned five indictments against the petitioner, charging him with assault with intent to murder (No. 90-1215, pursuant to G.L. c. 265, §15); armed robbery (No. 901216, G.L. c. 265, §17); kidnapping (No. 90-1217, G.L. c. 265, §26); assault and battery with a dangerous weapon (No. 90-1218, G.L. c. 265, §15A); and larceny of a motor vehicle (No. 90-1219, G.L. c. 266, §28).

The petitioner 's case and that of his codefendant, Gary Chaffee, were severed before trial. The petitioner filed pretrial discovery motions on June 8, 1990, seeking, *inter alia,* disclosure of agreements between the Commonwealth and prosecution witnesses and of promises, rewards, or inducements given to such witnesses. The court granted the motions. The Commonwealth did not disclose any information regarding any alleged agreement with Susan Chaffee (Gary's wife), or regarding any promises, rewards, or inducements offered to her. Neither t he petitioner nor his trial counsel had independent

3

knowledge of any such information.

On October 25, 1990, the petitioner moved to suppress all identifications of him by the victim, Mr. Archibald, and a witness, Ms. Watkins, and to dismiss the charges on the grounds that unduly suggestive identification procedures had tainted subsequent identifications.   After a hearing on November 28, 1990, the trial court (Travers, J.) suppressed evidence of any identification from a single photograph of the petitioner that the Worcester Police had shown to the victim but otherwise denied the motions.

Trial took place before the court (Mulkern, J.) and jury on November 30 and December 3, 1990.  On December 3, 1990, the jury returned a verdict of guilty on all indictments.  The petitioner  was sentenced to 30 to 40 years at MCI Cedar Junction on the armed robbery charge, with concurrent sentences of 18 to 20 years on the charge of assault with intent to murder and 9 to 10 years on each of the remaining charges.

On July 22, 1991, this Court granted the petitioner's permission to file a late notice of appeal *pro se*.  New counsel was appointed and a stay granted due to the filing of a motion for new trial.

The petitioner filed a motion for post-conviction relief in Superior Court on October 1, 1996, amended on December 6, 1999.  An evidentiary hearing was held before Judge Francis Fecteau on December 6, 7, and 30, 1999 because the original trial judge had retired.  Judge Fecteau denied the new trial motion by memorandum decision dated December 22, 2000, amended on January 8, 2001.   The petitioner  filed a timely notice of appeal both from his original convictions and from the denial of his motion for new trial.

4

On February 26, 2003, the Massachusetts Appeals Court affirmed the judgment of conviction and the order denying the petitioner's motion for a new trial. *Commonwealth v. Patnod,* 57 Mass. App. Ct. 1110, 784 N.E. 2d 50 (Supp. Ans. Exh. 5). On April 30, 2003, the Supreme Judicial Court denied the petitioner's application for leave to obtain further appellate review. *Commonwealth v. Patnod*, 439 Mass. 1104, 787 N.E. 2d 1058 (2003)(Supp. Ans. Exh. 7). The petition at bar was filed on April 30, 2004.

<u>STATEMENT OF FACTS</u> [1]

Daniel Archibald was a 26 year old resident of Weymouth in 1989. On December 15, 1989, he had been working as a taxi driver in Hingham for only about one month when he was dispatched to the Sports Emporium in Weymouth to pick up a fare. The petitioner got into the back seat and indicated that he wanted to be taken to Worcester. Mr. Archibald requested payment in advance but the petitioner did not have the money. The driver took a gold chain as collateral.

Mr. Archibald drove the petitioner to Main Street in Worcester, a trip which lasted over one hour. During the trip the two engaged in some conversation. The petitioner identified himself as "Mark," and said that he was from Quincy. The driver, on several occasions, was able to look at the petitioner 's face during the trip with an unobstructed view.

This was the driver's first time in Worcester, and he took the petitioner to a Sunoco Station on Main Street. The petitioner told the driver to beep the cab's horn but no one

_____

[1] The following section was derived from the Statement of Facts contained in the Brief of the Commonwealth. (Supp. Ans. Exh. 3 at 1-12). Transcript and other citations have been omitted.

5

came out.  The petitioner then got out of the taxi and went inside the building.  Once inside

791 Main Street in Worcester, he began calling for Gary Chaffee.   Gary's wife, Susan,

looked outside the parlor window and saw the petitioner shouting for her husband.  She

had seen the petitioner many times previously at her home and knew him to be her

husband's friend.

The petitioner yelled for Susan to wake up her husband, which she did.  She

recognized his voice.  Gary Chaffee left with the petitioner.

The petitioner and Chaffee instructed Archibald to drive them to several local

places.  Mr. Archibald indicated that he believed the two were trying to sell some jewelry.

On cross-examination, however, he said that he was not sure of the purpose of their visits

to the other locales, but due to the fact that they stated they would pay him for the ride and

that he was holding a necklace as collateral, he believed this was the purpose of their

activities.

While Archibald drove the petitioner and Chaffee around Worcester, both men

were in the back seat of the taxi, with the petitioner seated behind the driver. After making

several stops,  the three returned to the apartment near the Sunoco Station.  Mr. Archibald

waited outside an apartment while both the petitioner and his co-defendant went into a

building they first stopped at when they arrived in Worcester that evening.  He wanted

payment for his services, and realized that the gold chain he was given was not, in fact, real

gold.  Approximately six to ten minutes later, both Chaffee and the petitioner emerged

from the apartment, got into the back seat of the taxi, and the petitioner pulled out a knife

and put it to Archibald's throat.  Chaffee moved to the driver's seat while the driver slid

**6**

over to the passenger's side of the front seat.

While the petitioner held Archibald in the taxi at knife-point Sheryl Reid Watkins walked by the taxi at approximately 2:00 or 2:30 A.M. at the intersection of Main and Piedmont Streets in Worcester.  She was working at the time as a prostitute.  Ms.  Watkins noticed a taxi with three men inside. She approached the cab from the passenger's side and asked what the occupants were doing.  She asked if the  driver was all right, because she knew that the person in the driver's seat was Gary Chaffee.  She was familiar with Chaffee before that date but did not know his name.  She saw the driver in the front passenger seat, and saw the petitioner in the back seat with his arm around the taxi driver's throat.  The taxi was stopped by a street light, and she was able to see the petitioner's face.  She asked Archibald if he was all right, and the petitioner replied that he was.  She walked away and the taxi drove off.

Chaffee drove the taxi into a side street a few minutes from their previous location. The petitioner held the knife to Archibald's throat and ordered Archibald to empty his pockets. Archibald complied, and took $150 from his pocket.  The petitioner reached over and grabbed the items from Archibald's hands. He also pulled off Archibald's watch from his wrist.  The petitioner gave the money and watch to Chaffee, who got out of the taxi and went into a house, while the petitioner continued to hold Archibald.

A few minutes later, Chaffee emerged from the house and got into the driver's seat of the taxi.  He drove to Shepard Street, where they got out of the vehicle.  The petitioner then forced Archibald to get out of the car, led him to the rear of the taxi, Chaffee opened the trunk, and the petitioner forced Archibald to get inside.  The trunk lid was closed.

7

While in the trunk, the victim was able to hear voices engaged in conversation outside of the vehicle. The petitioner said, "He's not testifying on me," while the other voice asked the petitioner not to "do it." The petitioner then replied, "I'm going to kill this guy. I don't want him testifying on me."

A few minutes later the trunk was opened. Archibald's head was toward the front of the vehicle inside the trunk, and the petitioner slashed his throat with the knife. The petitioner tried to cut Archibald a second time, but the taxi driver pushed the knife away with his right hand. He was able to push the petitioner out of the way and then ran away.

The petitioner and Chaffee jumped into the taxi, hit a tree, backed up, and drove away. Cheryl Watkins saw the taxi drive down King Street and then onto Benefit Street, and the trunk was open.

A taxi pulled up to a nearby house and Archibald got the attention of the cab driver, who called for help. A police officer arrived and Archibald got into the back seat of the cruiser. Archibald told the police officer that the perpetrator had dark hair, a leather jacket and dungarees. Then the cab took him to the hospital where he remained until approximately noon.

At the hospital, Archibald spoke with several police officers, including Detective Bryant and Officer Brabbs. Officers Brabbs and Bryant took a statement from him at approximately 10:30 A.M. Archibald described the petitioner as follows: black hair, torn shirt, no facial hair, wearing a waist-length dark leather jacket with lines on the shoulders, dungarees, and had dark circles under his eyes, and he appeared to be "high." When he was released from the hospital, he went to the Worcester Police Station. Then the owner of

8

the taxi company picked him up and took him home.

On December 15, 1989, Archibald went to the Weymouth Police Station to meet with some Worcester police officers, including Detective Wojtanek and Sergeant Daly.  The officers had brought with them some photographs in order to see whether Archibald could make an identification of the assailants.  The photographs were separated into two groups, with nine to ten photos in each group.  The officer showed Archibald the photos one group at a time, and simply asked Archibald if he recognized anyone in the photos. He picked out a photo of the petitioner 's brother, Dwayne, from the first array. He did not pick out a photo of the petitioner from the second array.  Archibald testified that Dwayne looked very much like his brother, Mark.

At the time of the incident, Archibald was taking two prescription medications for manic depression which he had taken for four years: Navane and Lithium.  He took the medications that evening; he was not confused at all on the date he took the trip to Worcester.

Susan Chaffee was in court two days prior to her testimony in the petitioner's trial on charges of possession with intent to distribute.  Several other charges had been dismissed, including possession with intent to distribute within a school zone, and a firearms violation.  Susan testified that she was not promised leniency from the District Attorney's Office on the pending charges in exchange for her testimony against Mark Patnod.

Worcester Police Officer Margaret Ryan, assigned to the Bureau of Criminal Identification, was able to locate several latent fingerprints on the window and right trunk

9

area of taxi.  She compared the latent prints to the petitioner 's fingerprints.  The prints

taken from the rear of the taxi had twelve points in common with the petitioner 's prints

taken from the police station.[2]  Even though the latent print contained some dirt and air

pockets, possibly from the taxi or from the tape, the presence of these items did not

interfere with her ability to make the twelve points of comparison.  No points of

dissimilarity were found.  Officer Ryan concluded that the print taken from the rear of the

taxi was made by the petitioner.  For that reason, she did not compare the latent print to

any prints known to be from Dwayne Patnod.

> Pearl Anne Weeks of Winchester, New Hampshire, claimed that on December 14,

she was at a bar in Winchendon, Massachusetts.  She met a man named Mark at the bar

who was very intoxicated.  They conversed for awhile, and the man indicated that he had

no place to go and that he was not from the area.  She invited him to spend the night at her

house.  She took him home and he slept on the couch.  She went to work the next morning

while he remained in her house.  After she finished working at about 3:00 P.M., she

returned home and gave him a ride to Route 2 at the Gardner exit.

> She saw him later at Cedar Junction but did not talk to him because he was talking

with a woman she thought was his wife.  She was contacted by defense counsel to testify at

trial, and was told by counsel not to speak with the prosecution before trial.  Her son,

David, also testified that the petitioner spent the night at his home on December 14th.  He

also testified at the request of defense counsel, and was told by counsel not to talk to the

---

[2] The witness testified that the FBI makes identifications with eight points of comparison or more, and have been known to use as few as six.  She has not made any identifications previously with less than seven points.

10

district attorney's office prior to trial.

Gary Chaffee testified for the defense, against the advice of his counsel.  Chaffee indicated that he was at his home at 791 Main Street in Worcester and was awakened in the early morning of December 15th by a car horn.  He followed his wife to a window and looked outside.  He saw a taxi in the parking lot next door.  He identified the passenger in the taxi as Dwayne Patnod, who was then living with his father in Worcester.  Chaffee said that he joined Dwayne in the cab and asked him why he was there.  He claimed that Dwayne wanted to buy cocaine, which he did not have.  They went to several other locations in the area looking to buy cocaine with some jewelry but were not successful. They returned to Chaffee's house and agreed to rob the taxi driver to get money to buy cocaine.

Chaffee further testified that Dwayne grabbed the driver from behind and Chaffee went from the back seat into the driver's seat.  Dwayne put the driver in the trunk and Chaffee took the money and bought some cocaine.  They argued about leaving the driver in the trunk, but Dwayne indicated that the driver could identify him.  Chaffee stayed in the car while Dwayne went to the back of the car.  There was a commotion, and the driver ran down the street.  Chaffee then went home.  Chaffee later discussed this incident with his wife.

Susan Chaffee  testified that Gary told her he was with Mark Patnod on the night of December 15th.  He also told her that Mark had slit a taxi driver's throat.

11

## STANDARD OF REVIEW

Because the petition for writ of habeas corpus was filed after the effective date of the

Antiterrorism and Effective Death Penalty Act (AEDPA), this Court's review of the

petitioner's claims is governed by that statute.  *Lindh v. Murphy,* 521 U.S. 320, 336 (1997).

The relevant statutory provision, 28 U.S.C. § 2254(d)(1), states:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim—
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable
>> application of, clearly established Federal law, as determined by the Supreme
>> Court of the United States

In *Williams v. Taylor,* 529 U.S. 362, 412 (2000) (O'Connor, J., Opinion of the Court)

the Supreme Court gave independent meaning to both the "contrary to" and the

"unreasonable application" clauses of the statute.  *See id*. at 405.  Under the first prong of §

2254(d)(1), the Court stated that a decision may be "contrary to . . . clearly established

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C.

§ 2254(d)(1), in two ways.  First, "[a] state-court decision will certainly be contrary to our

clearly established precedent if the state court applies a rule that contradicts the governing

law set forth in [the Supreme Court's] cases."  *Williams,* 529 U.S. at 405.  Second, "[a]

state-court decision will also be contrary to this Court's clearly established precedent if the

state court confronts a set of facts that are materially indistinguishable from a decision of

this Court and nevertheless arrives at a result different from our precedent."  *Id.* at 405-

406. [3]

Under the second prong of § 2254(d)(1), "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case" qualifies as "'an unreasonable application of . . . clearly established Federal law.'" *Id.* at 407 (quoting 2254(d)(1)). In determining whether a state-court decision unreasonably applies Supreme Court precedent, "a federal habeas court should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. As the Court stressed, "the most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). Under the "unreasonable application" clause, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable. *Id.* at 411. The First Circuit has explained the degree of error that must be shown by the petitioner to reach the level of an "objectively unreasonable" state court decision. "[S]ome increment of incorrectness beyond error is required….The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." *McCambridge v. Hall,* 303 F.3d 24, 36 (1st Cir. 2002) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

---

[3] The court interpreted the phrase "clearly established Federal law, as determined by the Supreme Court of the United States," a phrase shared by both clauses, to "refer[] to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Id.* at 412. The statute thus "restricts the source of clearly established law" to the Supreme Court's holdings. *Id.*

13

In addition, under AEDPA, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The "presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the finding of fact." *Sumner v. Mata*, 455 U.S. 591, 593 (1982); *Norton v. Spencer*, 351 F.3d 1, 6 (1st Cir. 2003). As the First Circuit has noted, "[a] habeas petitioner must clear a high hurdle before a federal court will set aside any of the state's factual findings." *Mastracchio v. Vose*, 274 F.3d 590, 598 (1st Cir. 2001).

## ARGUMENT

**I.   THE STATE COURT'S FINDING OF FACT THAT THERE WERE NO AGREEMENTS BETWEEN THE COMMONWEALTH AND TWO PROSECUTION WITNESSES IS PRESUMPTIVELY CORRECT AND THE STATE COURT ADJUDICATION OF THIS ISSUE IS NOT CONTRARY TO OR AN UNREASONABLE APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW.**

In Ground One the petitioner alleges that the prosecution withheld evidence of agreements for leniency offered to two Commonwealth witnesses in return for their testimony at trial, in violation of his right to due process, a fair trial and confrontation and cross-examination of witnesses as guaranteed by the 5th, 6th and 14th amendments. (Petition, p. 5, ¶ 12A). The Massachusetts Appeals Court rejected the petitioner's premise that any agreements between the Commonwealth and the witnesses ever existed. The court explicitly adopted the motion judge's findings of fact that no such agreements had been made which was issued after a four day evidentiary hearing.

14

**The Appeals Court stated:**

(a) Agreement with Susan Chaffee.  At the hearing on the [petitioner's] motion for a new trial, the [petitioner] claimed his State and Federal constitutional rights to a fair trial had been violated because the Commonwealth did not, prior to and during his trial, disclose that it had offered Susan Chaffee a deal on pending criminal charges in exchange for her testimony against him at his trial.  He now contends that the motion judge erred in finding there was no express or implied agreement between the Commonwealth and Chaffee.  The question whether there was an express or implied agreement was a question of fact to be resolved by the judge.  The judge's finding on this issue is sufficiently supported by the evidence.

The Commonwealth's witnesses, Susan Chaffee, Progen, and Landry, testified that there was no agreement between the Commonwealth and Susan Chaffee.  The petitioner 's witnesses, attorney Maria Scozzafava and Gary Chaffee, testified there was an agreement.  The petitioner 's argument that the judge failed to consider that the petitioner 's witnesses did not have a motive to lie is of no avail.  The judge's assessment of the witnesses' credibility was obviously based on many factors.  The mere fact that Susan Chaffee's six to ten year sentence was reduced to a probationary term does not, as the petitioner suggests, necessarily lead to the conclusion that there was an agreement for her testimony.

(b) Agreement with Watkins.  The [petitioner] claims an undisclosed agreement between Watkins and the Commonwealth was made in exchange for Watkins's testimony against him at his trial.  The [petitioner's] claim that the motion judge erred in failing to find such an agreement between the Commonwealth and Watkins is of no avail.  The motion judge stated he did not believe the testimony of Dwayne Burrell.  The judge is the final arbiter of matters of credibility. (Citations omitted).

*Commowealth v. Patnod*, 57 Mass. App. Ct. at 1110 (Supp. Ans. Exh. 5 at 2-3).

Whether a cooperation agreement existed between the prosecutor and a witness is a factual determination.  *Shabazz v. Artuz*, 336 F. 3d 154, 260 (2d Cir. 2003), *citing Wedra v. Thomas*, 671 F. 2d 713, 717 (2d Cir. 1982).  Here the motion judge found that no agreements had been made and his findings as adopted by the Massachusetts Appeals Court are presumed to be correct.  The petitioner has failed to carry his burden of rebutting the presumption of correctness by clear and convincing evidence as required by

15

28 U.S. C. §2254(e)(1).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective

April 24, 1996,  significantly altered the prior provision governing the standard to be

applied to state court findings of fact.  The new provision, codified as 28 U.S.C. § 2254(e),

reads, in pertinent part, as follows:

> (1) In a proceeding instituted by an application for a writ of habeas corpus by
> a person in custody pursuant to the judgment of a State court, *a determination
> of a factual issue made by a State court shall be presumed to be correct*.  The
> applicant shall have the burden of rebutting the presumption of correctness
> by clear and convincing evidence.

d)).  AEDPA limits the circumstances in which a habeas petitioner may challenge state

court determinations of factual issues, and requires federal habeas courts to give greater

deference to those factual determinations than under prior law.  See 17A Charles A.

Wright et al., Federal Practice & Procedure § 4265.2, at 74-75 (West Supp. 1998) (noting

that AEDPA "drastically changed in substance" effect to be give state court findings);

*Otsuki v. DuBois*, 994 F. Supp. 48, 49 (D. Mass. 1998) ("the strong presumption in favor of

state court findings that previously existed under 28 U.S.C. § 2254(d) is even stronger

under the reformulated provisions of the AEDPA").  "[F]acts" are defined as "basic,

primary, or historical facts: facts in the sense of a recital of external events and the

credibility of their narrators." *Sanna v. Dipaolo*,  265 F.3d 1, 7 (1st Cir. 2001) quoting

*Bryson v. Ward*, 187 F.3d 1193, 1211 (10th Cir.1999) (citation and internal quotation marks

omitted).

The presumptively correct facts found by the motion judge and Massachusetts

Appeals Court contradict the petitioner's position that there was an agreement between the

16

witnesses and the Commonwealth.   Contrary to the petitioner's argument, the prosecutor

in Patnod's case was not obligated to disclose an agreement under *Brady v. Maryland*, 373

U.S. 83  (1973) and *Giglio v. United States*, 405 U.S. 150 (1972) if none existed.  To establish

a *Brady* claim, the petitioner must demonstrate: (1) the prosecutor suppressed evidence, (2)

favorable to the defense, and (3) material to guilt or punishment. *Brady*, 373 U.S. at 87;

*Miller v. Dretke*, 404 F.3d 908 (5th Cir.2005).  Under *Giglio*, it is a violation of due process

for the government to fail to disclose a promise made to a witness that he or she would not

be prosecuted if he testified for the prosecution.  *Giglio*, 405 U.S. at 150.  In order to prevail

on a *Giglio* claim, a petitioner must establish that the prosecutor "knowingly used perjured

testimony, or failed to correct what he subsequently learned was false testimony," *United*

*States v. Alzate*, 47 F.3d 1103, 1110 (11th Cir.1995), and that the falsehood was material.

*United States v. Agurs*, 427 U.S. 97, 103(1976).

        There is no clearly established Supreme Court law that mandates disclosure if no

agreements were made. The motion judge and the Massachusetts Appeals Court found that

there was no credible evidence of a promise and this presumptively correct fact has not

been rebutted.  Although the petitioner may disagree with the motion judge's view of the

evidence, his credibility assessments and his legal conclusions, such disagreement does not

equate to clear and convincing evidence of error.  The judge's  written findings of fact and

conclusions of law were issued after a full scale evidentiary hearing on the merits, made by

state court of competent jurisdiction, in a proceeding to which petitioner and the

Commonwealth were parties.  28 U.S.C.A. § 2254(d).  *See Alston v. Redman*, 34 F.3d 1237

(3d Cir. 1994).  The motion judge personally observed the demeanor of the prosecutor and

the witnesses as they testified and had a unique opportunity to assess their acumen, powers
of recall and credibility.  *See Weaver v. Bowersox*, 241 F. 3d 1024, 1030-1031 (8th Cir. 2001).
There was great attention given to the issue of whether an agreement existed and the
petitioner had ample time and opportunity to convince the motion judge of his position.
The petitioner failed to do so.

    The motion judge was conscientious in meticulously reviewing all the documentation
in the case.   As the motion judge stated in his Memorandum Decision, he was assigned the
matter on February 5, 1997, because the trial judge had retired.   A hearing was held one
and one-half years later "due to the need for post-conviction investigation, discovery and
the preparation of transcripts of various pre-trial proceedings" (Supp. Ans. Exh. 2 at  A.
00521).   Following a four day evidentiary hearing, the judge issued a decision on December
22, 2000, after considering the evidence "which included affidavits from relevant
participants, transcripts of the trial, the hearing on the motion to suppress identifications
and the probable cause hearing in the District Court, the arguments of the parties and the
pertinent authorities" before making findings of fact and rulings of law. (Supp. Ans. Exh. 2
at  A. 00521).

<u>A. Susan Chaffee</u>

    The motion judge totally rejected the petitioner's contentions regarding the alleged
agreement between the prosecutor and Susan Chaffee.   In his decision the motion judge
recounted the course of events surrounding Chaffee's plea of guilty to drug charges and
concluded that the prosecutor in that case was totally unaware of her role as a
Commonwealth witness in the Patnod case at the time that the plea was negotiated.  (Supp.

18

Ans. Exh. 2 at A. 00523-00527.)  The judge found that the prosecutor in Chaffee's case was

unaware of the details of the case against Patnod, was not the prosecutor on that case and

had not up to the day of Chaffee's plea spoken to the assistant district attorney who was

handling the petitioner's case.  (Supp. Ans. Exh. 2 at 00524).  The judge found that when

"Chaffee testified against Patnod,  she did so without there having been any agreement

with the Commonwealth that her sentence would be anything other than that previously

recommended, namely 6 to 10 years in prison.  (Supp. Ans. Exh. 2 at 00525).

        The judge found that the Patnod prosecutor had no discussions with Chaffee or her

attorney, Ms. Scozzafava,  regarding any promises or hopes of lenient treatment in return

for her testimony against Patnod. (Supp. Ans. Exh. 2 at A. 00525).  The judge found both

the Patnod prosecutor and Chaffee credible on the central issue of whether any agreement

had been made.   (Supp. Ans. Exh. 2 at 526).  Moreover, noted the judge, Chaffee could not

avail herself of any privilege not to testify and the prosecutor did not need to make any

promises to Chaffee or Scozza-Fava nor did he do so.  (Supp. Ans. Exh. 2 at 00526).  The

motion judge stated that the prosecutor "did not make any statement whatsoever that led

either to believe that Chaffee would be 'taken care of' due to her testimony against

Patnod." (Supp. Ans. Exh. 2 at 00526).  The judge noted that Chaffee had made a

statement to one of the investigation police officers within a week of the offense identifying

Mark Patnod by name as the person calling for her husband and with whom he left, which

was consistent with her trial testimony and prior to her own arrest for the drug offenses.

(Supp. Ans. Exh. 2 at 00526).  The judge concluded that "to the extent that any other

witness testified that there was any expectation of favorable treatment of Chaffee in her

19

case as a result of her testimony against Patnod, they are disbelieved." (Supp. Ans. Exh. 2 at A. 00526).

Following Patnod's trial and conviction, the prosecutor became concerned for the safety of Chaffee and her child and the judge found this concern was reasonable, especially in light of the trial evidence that the petitioner vowed to eliminate the victim as a witness and then cut the victim's throat so he could not testify against him. (Supp. Ans. Exh. 2 at A. 00526.) Based on these safety concerns, the Commonwealth assented to Chaffee's motion for a revision of sentence and recommended a suspended sentence. (Supp. Ans. Exh. 2 at 000527).  It was not until the hearing that Chaffee learned of the Commonwealth's recommendation.  (Supp. Ans. Exh. 2 at 527).

The petitioner claims that the Massachusetts Appeals Court overlooked "clear and convincing evidence" of an agreement between the Commonwealth and Chaffee.  He contends that Scozzafava's testimony was mischaracterized and discounted, and that the safety concerns for Chaffee were pretextual.  (Memorandum of Law In Support of Petition at 31-33).   Basically the petitioner is reprising prior arguments made to the motion judge and the Massachusetts Appeals Court to no avail.  The judge did not give "short shrift to Ms. Scozzafava's testimony", as the petitioner claims, but carefully considered and rejected it. The judge found that:

> "The prosecutor was reluctant to negotiate with Scozza-Fava at all due to his perceptions of her inexperience and his sensitivity and his sensitivity to the issues of promises, rewards and inducements, especially his duty to disclose any such agreements.  Scozza-Fava was not present during any witness preparation session that Landry had with Chaffee, nor did Scozza-Fava know what significance, if any, Chaffee had as a witness in the Patnod case." (Supp. Ans. Exh. 2 at 000525).

20

The judge concluded that the Patnod prosecutor "had no discussions with Scozza-Fava nor Chaffee regarding any promises or hopes of lenient treatment in return for her testimony against Patnod, prior to Chaffee's testimony." (Supp. Ans. Exh. 2 at 000527).  The safety concerns regarding the potential harm that could befall Chaffee in prison in retaliation for testifying against the petitioner were not a pretext but real; Scozza-Fava was the first to raise them to the Commonwealth after learning of the underlying facts from Chaffee. (MNT I at 62).

### B. Sheryl Reid Watkins

The only evidence offered by the petitioner in support of his allegation that there was an undisclosed plea agreement between the prosecution and Sheryl Watkins was the motion hearing testimony of Duane Burell.   Burell testified that he met Watkins approximately in 1996 while attempting to score some cocaine in Worcester and that she told him that the police persuaded her to identify Mark Patnod instead of his brother Dwayne in return from some sort of promise.   (Supp. Ans. Exh. 2 at 000528). The judge made a solid credibility assessment, stating that "the testimony from Burrell is not believed." (Supp. Ans. Exh. 2 at 000528).  The judge concluded that there was no credible basis to conclude that there was any promise, reward or inducement made to Watkins in consideration of her testimony against Patnod.   (Supp. Ans. Exh. 2 at 000527).

The judge's findings of fact on both the Chaffee and Watkins claims rested on his credibility assessments of the various witnesses made during the evidentiary hearing. Credibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier of fact. *Sanna v. DiDiPaolo*, 265 F. 3d 1, 10 (1st Cir. 2001).  *See United States v.*

21

*Alicea*, 205 F.3d 480, 484 (1st Cir.2000); *Johnson v. Watts Regulator Co.*, 63 F.3d 1129, 1139

(1st Cir.1995).  As in *Sanna*, the motion judge "spoke clearly" regarding the witnesses and

the Massachusetts Appeals Court "resoundingly endorsed" his credibility assessment.

*Sanna v. Dipaolo*, 265 F. 3d at 10.   "Under these circumstances, it would be wholly

inappropriate for a federal court to repastinate soil already thoroughly plowed and delve

into the veracity of the witnesses on habeas review. " *Id.*   Since the challenged factual

finding was based upon a plausible credibility determination, the petitioner's claim should

be rejected.

        The petitioner's reliance on *Gilday v. Callahan*, 59 F. 3d 257 (1995) and *Ely v*

*Matesanz*, 983 F.  Supp 21 (D. Mass. 1997) for the proposition that there was an agreement

between witness and prosecutor is misplaced.  Both cases predate AEDPA which

significantly changed the legal landscape for habeas corpus petitioners in general and

strengthened the presumption of correctness for state court findings of fact in particular.

*See Otsuki v. DuBois*, 994 F. Supp. at 49.  In  *Gilday,* the First Circuit undertook a de novo

review of the Brady/Giglio claims as prior habeas law allowed.  *Gilday*, 59 F. 3d at 268.

AEDPA now requires a deferential review of the state court adjudication of the issue.  *See*

*infra*.  More importantly, in *Gilday*, both the motion for a new trial judge and the SJC had

made a finding of fact that there <u>was</u> a solid promise of leniency between the prosecutor

and the attorney for a witness unlike the petition at bar.  Following a hearing in *Gilday*,  the

motion for a new trial judge found that the prosecutor had told the attorney that,  in

exchange for his client's testimony, the prosecutor would attempt to reach a disposition of

pending criminal charges that would leave the witness with no criminal record. *Gilday*, 59

22

F. 3d at 268. The witness himself was not told of the arrangement and denied on cross-
examination that any deal had been made for his testimony.  *Id.*  Subsequently, the new
trial motion judge concluded that there was an agreement and the SJC, the federal district
court and the First Circuit all adopted this finding of fact.  Thus in *Gilday* the state and
federal courts acknowledged the indisputable nature of the findings of fact of the new trial
motion judge who had heard the evidence and assessed the credibility of the witnesses first
hand.

In *Ely*, unlike the case at bar, there existed a detailed written plea agreement
between a  witness and prosecutor which included *inter alia* a condition that the witness
would testify at a co-defendant's trial.  *Ely*, 983 F. Supp. at 26.  The written plea agreement
had been executed around the time of trial in 1979 but was not discovered until sixteen
years later.   In the face of the written agreement the district court found that the
prosecutor had failed to disclose exculpatory evidence and failed to correct false testimony.
*Ely*, 983 F. Supp. at 22.  Clearly *Ely* is totally dissimilar to the instant petition where there
were no written or unwritten, formal or informal, express or implied agreements.

The state court adjudication is not contrary to nor an unreasonable application of
clearly established Supreme Court law since there is no clearly established Supreme Court
law that  requires disclosure of an agreement where there is no evidence that one existed.
*Hill v. Johnson*, 210 F. 3d 481, 484-486 (5th Cir. 2000).  The judge rejected the petitioner's
version of the facts and found his  witnesses not credible.  Given the judge's assessment of
the evidence and his view of the credibility of the witnesses, his presumptively correct facts
must be accepted.   The Massachusetts Appeals Court decision rejecting his position is not

contrary to nor an unreasonable application of Supreme Court law.

II.    **THE STATE COURT ADJUDICATION OF GROUND TWO RELATING TO IDENTIFICATION PROCEDURES WAS NOT CONTRARY TO NOR AN UNREASONABLY APPLICATION OF CLEARLY ESTABLISHED SUPREME COURT LAW**

In Ground Two, the petitioner asserts that his conviction was obtained by

unconstitutional identification procedures which violated his rights to due process, fair

trial and confrontation and cross -examination under 5th, 6th and 14th amendments. .

(Petition, p. 5, ¶ 12B).  Specifically he claims that the in-court identifications of the

petitioner as the perpetrator that were made by the victim, Daniel Archibald, and the

witness, Sheryl Reid Watkins, were tainted by prior identification procedures, i.e., the

display to the victim of a single photograph by a police officer and the circumstances under

which the Mr. Archibald and Ms. Watkins viewed the petitioner at the probable cause

hearing. (Pet. Mem. at 37-40).

Prior to trial, the petitioner moved to suppress identifications made by the victim,

and the witness.  Following an evidentiary hearing, the judge made findings of fact and

rulings of law from the bench, rejecting the petitioner's argument that the procedures by

which the victim and witness made identifications were unnecessarily suggestive.  (See

Transcript of Motion to Suppress (MS) hearing dated November 28, 1990 at pp. 92-107).

In his decision, the suppression motion judge recounted the evidence of the crimes and the

opportunities that the victim had to observe the petitioner at length. (MS at p. 93-95).  The

judge duly noted that both the victim and witness had identified the petitioner's brother as

the assailant when shown arrays of photos of males by the police on two occasions but had

24

identified the petitioner at a probable cause hearing.  (MS at pp. 95-102).  The judge found

"nothing that was unduly suggestive or suggested at all on the part of the police in the

demonstrations made with either of the witnesses." (MS at p. 103).  He noted that the

petitioner and his brother had a "remarkably similar appearance" including similar facial

bone structure; nose and overall head shape and deep set eyes. (MS at 104).  The judge did

exclude one out of court identification in which a police officer showed the victim a single

photography of the petitioner but found the other identification procedures non-suggestive.

Post-trial, the petitioner filed a motion for a new trial and the motion judge affirmed

the first judge's decision.  In affirming the decisions of both judges, the Massachusetts

Appeals Court stated:

> In deciding whether to allow the [petitioner's] motion for a new trial on this
> claim, the judge had to determine the correctness of the first motion judge's ruling
> that excluded only the single photograph identification conducted months after the
> incident.  The [petitioner] argued that the single photograph identification tainted
> the subsequent in-court identifications by Archibald and Watkins.  The judge, citing
> *Commonwealth v. Johnson*, 420 Mass. 458, 463, 650 N.E.2d 1257 (1995), found that
> the in-court identifications were independent from the suggestive single photograph
> identification.  Our review convinces us that the judge's decision was not error.
>
> The question is whether the subsequent identifications were "tainted" by the
> suppressed identification.  See *Commonwealth v. Botelho*, 369 Mass. 860, 865, 343
> N.E.2d 876 (1976) (initial suggestive identification is suppressed, as well as all
> subsequent "tainted" identifications).  Contrary to the [petitioner]'s contentions,
> there was sufficient evidence to support a finding that the in-court identifications of
> the [petitioner] were produced from independent sources and, therefore, not fatally
> flawed.  Archibald had numerous opportunities to view the [petitioner] on the night
> of the incident.  *See Commonwealth v. Odware*, 429 Mass. 231, 236, 707 N.E.2d 347
> (1999).  He drove him from Weymouth to Worcester, over an hour's drive.  The
> motion judge noted Archibald paid particular attention to the [petitioner] in the
> back seat of the taxi because of the [petitioner]'s conduct.  Archibald also had a face
> to face encounter with the [petitioner] when the [petitioner] slashed his throat and
> tried to stab him. As for Archibald twice picking out the [petitioner]'s brother in
> the two photo arrays, the judge found this a reasonable mistake since the two men

looked alike and because Archibald's nervousness after the attack may have contributed to his mistaken selections.[4]

As for Watkins, the judge found she had ample opportunity to observe the [petitioner], given her heightened concern for the person in the passenger seat with an arm around his throat when she approached the vehicle from the passenger's side to inquire about Archibald's welfare.

Because the suppressed single photo identification did not taint the subsequent in-court identifications, the [petitioner]'s claim in this respect is without merit.

*Commonwealth v. Patnod,* 57 Mass. App. Ct. at 1110. (Supp. Ans. Exh. 5 at p. 4).

The state court adjudication was not contrary to an unreasonable application of clearly established Supreme Court law. The Supreme Court has held that, although there are hazards associated with photographic identifications, it was unwilling to prohibit such identification procedures "either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement." *Simmons v. United States*, 390 U.S. 377, 384 (1968). Instead the court advised that each case must be considered on its own facts. Eyewitness eyewitness identification at trial following a pretrial identification by photograph will be set aside only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id. See Stovall v. Denno*, 388 U.S. 293, 301--302 (1972).

*Simmons* established a two-pronged test to apply in identification challenges. First, a court must decide whether the out-of-court identification was impermissibly suggestive. *Simmons*, 390 U.S. at 384; *Gullick v. Perrin*, 669 F.2d 1, 6 (1st Cir.1981). If the court decides

---

[4] In any event, as the Massachusetts Appeals Court pointed out, Archibald's mistakes were fodder to be used by the petitioner to impeach Archibald's reliability during the trial.

26

that the procedures surrounding the out-of-court identification were not overly suggestive,

then the court's due process inquiry ends. *United States v. Maguire*, 918 F. 2d 254, 263 (1st

Cir. 1990); *Edwards v. Murphy*, 96 F. Supp. 2d 31, 47 (D.Mass. 2000); *Otsuki v. Dubois*, 994

F. Supp. 47, 58 (D. Mass. 1998).  The United States Court of Appeals for the First Circuit

has employed this conclusive standard numerous times to terminate exclusionary inquiry.

*Maguire,* 918 F. 2d at 263.  The second prong of *Simmons* is invoked only when a

photographic array  has been deemed impermissibly suggestive; it measures the reliability

of the identification based on the totality of the circumstances.  *See Neil v. Biggers*, 409 U.S.

188, 199-200 (1972) (court should consider witness's opportunity to view the suspect, degree

of attention, accuracy of prior description, level of certainty, and time lapse between crime

and identification).  *See also Manson v. Brathwaite*, 432 U.S. 98, 114 (1977) (concluding

that reliability is the "linchpin" in ascertaining admissibility of identification evidence);

*United States v. Bouthot*, 878 F.2d 1506, 1514 (1st Cir.1989) (applying the second prong of

"two-part test that is followed in this Circuit" after determining identification was

impermissibly suggestive).  Even "a suggestive and unnecessary identification procedure

does not violate due process so long as the identification possesses sufficient aspects of

reliability." *Manson v. Brathwaite*, 432 U.S. at 106.  Reliability is established by

considering:

> the opportunity of the witness to view the criminal at the time of the crime,
> the witness' degree of attention, the accuracy of his prior description of the
> criminal, the level of certainty demonstrated at the confrontation, and the
> time between the crime and the confrontation [as weighed against] the
> corrupting effect of the suggestive identification itself.

*Id.* at 114.

27

The petitioner's contention that the in-court identifications by the victim and the witness were irredeemably tainted by the single photograph identification and circumstances of the probable cause hearing identification ignores the factual findings of two judges that were supported by the evidence and adopted by the Massachusetts Appeals Court. As the first judge found, there was evidence at the suppression hearing that the victim had many opportunities to view the petitioner on the night of the crime. He drove his taxi with the petitioner in the back seat for a period of one and one-half hours from Weymouth to Worcester. He looked at the petitioner on a number of occasions during the ride in the rear view mirror, every time that he heard sounds coming from the back seat, such as a cough or when the petitioner put out a cigarette. The victim had an chance to see the petitioner while they waited for Gary Chaffee to come out of the apartment, when he drove the petitioner to several locations in Worcester, forced the victim out of the taxi at knife point and forced him into the trunk of the taxi. The victim spent about one half hour with the petitioner once they arrived in Worcester. The petitioner then slashed the victim's throat. When the victim observed the petitioner, his attention was very focused. The victim also gave a detailed description of the petitioner several hours after the incident. The judge found that the victim had an "intense interest" in the petitioner's appearance because of his unusual conduct from the time that the victim picked him up until the time of the actual attack. (MS at 93-94).

With regard to Ms. Watkins, the suppression motion judge found that she had ample opportunity to observe the petitioner at the time of the kidnapping. (MS 105). He found that she was very concerned about what taking place, particularly with the safety of

28

the cab driver who appeared to be suffering an attack from the person she observed in the back seat of the taxi. "Under those circumstances it appeared that she not only was aware that a crime was in progress, but she also was aware of the victim and the assailant, and for that reason she took particular note of the individual. " (MS 105-106).

The judge also found that the identifications by the victim and the witness at the probable cause hearing were "spontaneous and at the time they were made the [petitioner] was not particularly singled out in any fashion."(MS at 106). The subsequent placing of the petitioner, later in the hearing, in a different location did not taint the identifications which were made earlier in the proceedings. (MS at 106). [5]

The Appeals Court's adjudication focused on the factors cited by the Supreme Court to assess reliability of the identifications which is the "linchpin" in ascertaining admissibility of identification evidence." *Manson v. Brathwaite*, 432 U.S. at 106. The Appeal Court rejected the petitioner's claim on direct appeal under state court precedent of *Commonwealth v. Johnson*, 420 Mass. 458, 650 N.E.2d 1257 (1995) which differs substantially from *Manson*. Under *Manson*, an unnecessarily suggestive identification may be admitted so long as it is reliable. In Massachusetts, an unnecessarily suggestive identification cannot be admitted, but an in-court identification may be allowed so long as the witness can establish a source for the identification which is independent from the unnecessarily suggestive identification. *Id.* at 463-464. The suppression motion

---

[5] The victim testified at the probable cause hearing that he saw the petitioner seated alone at the opposite end of the courtroom. Cheryl Watkins testified at the probable cause hearing at a time that the petitioner was seated at the opposite end of the courtroom. She was in the hallway when the petitioner was brought into the courtroom.

29

judge met the higher Massachusetts standard in this case finding that the identifications of

Mr. Archibald and Ms. Watkins were reliable as well as independent from any prior

identifications.   Clearly, the adjudication of the state appeals court and two judges that

ruled on the issue was not contrary to or an unreasonable application of *Simmons* or

*Manson* Supreme Court precedents.

III.    THE STATE COURT ADJUDICATION OF GROUND THREE REGARDING
        ALLEGED INEFFECTIVE TRIAL COUNSEL IS NOT CONTRARY NOT AN
        UNREASONABLE APPLICATION OF STRICKLAND V. WASHINGTON.

        In Ground Three, the petitioner alleges that trial counsel made several missteps

which violated his right to the effective assistance of counsel.  He claims that trial counsel

> (1) failed to obtain the criminal records of prosecution witnesses
> (2) failed to obtain the victim's medical records or otherwise develop facts about the
> victim's manic depressive illness and medications
> (3) failed to make any attempt to compel the petitioner's half-brother, Dwayne, to
> appear at trial
> (4) failed to obtain an official transcript of the probable cause hearing
> (5) failed to seek a required finding of not guilty
> (6) failed to object to the prosecutor's unsupported assertions about Ms. Chaffee
> and a defense witness, Pearl Weeks, during closing, and failed to object to unfair
> cross-examination of another defense witness, Gary Chaffee.
> (7) counsel at the probable cause hearing failed to take steps to prevent the
> suggestive circumstances (Petition, p. 5, ¶ 12C)

        In *Williams v. Taylor*, 529 U.S. at 390-391, the Supreme Court held that *Strickland v.*

*Washington*, 466 U.S. 668 (1984) was the clearly established federal law that controlled

claims related to ineffective assistance of counsel.  The *Strickland* analysis may be stated as

follows: to determine whether counsel's performance was sufficient under the Sixth

Amendment, the inquiry "is whether counsel has brought 'to bear such skill and

knowledge as will render the trial a reliable adversarial testing process.'"  *Scarpa v.*

30

*DuBois*, 38 F.3d 1, 8 (1st Cir. 1994), *cert. denied*, 513 U.S. 1129 (1995), *quoting Strickland v. Washington*, 466 U.S. 668, 688 (1984).  *See Bell v. Cone*, 122 S.Ct. at 1850.  In state court, the petitioner bore the heavy burden of proving ineffective assistance, *Scarpa v. DuBois*, 38 F.3d at 8-9; *Lema v. United States*, 987 F.2d 48, 51 (1st Cir. 1993), which required a two-part analysis.  First, the petitioner is required to show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland v. Washington*, 466 U.S. at 690.  That is, he needs to establish "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  The standard "demands a fairly tolerant approach," *Scarpa v. DuBois*, 38 F.3d at 8, as the Constitution does not guarantee "a letter-perfect defense or a successful defense." *United States v. Natanel*, 938 F.2d 302, 309 (1st Cir. 1991), *cert. denied*, 502 U.S. 1079 (1992).  *See Williams v. Taylor*, 529 U.S. at 390-391; *Matthews v. Rakiey*, 54 F.3d 908, 916 (1st Cir. 1995).

The state court was not to apply the performance standard "in hindsight, but based on what the lawyer knew, or should have known, at the time his tactical choices were made and implemented." *United States v. Natanel*, 938 F.2d at 309.  Moreover, that court was required to "'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Scarpa v. DuBois*, 38 F.3d at 8, *quoting Strickland v. Washington*, 466 U.S. at 689.  *See Genius v. Pepe*, 147 F.3d 64, 66 (1st Cir. 1998) ("counsel's judgments in formulating the defense strategy are entitled to substantial deference"), *cert. denied sub nom., Genius v. Hall*, 526 U.S. 1121 (1999).  But this is only the first part of the test.  The petitioner is also required to demonstrate to the state court that

he was prejudiced by counsel's alleged errors — that is, he is required to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. at 694; *Scarpa v. DuBois*, 38 F.3d at 8, 16. *See Bell v. Cone*, 122 S.Ct. at 1850. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at 694. Finally, counsel's alleged blunders were not to be "judged solely by the 'surrounding circumstances' of the representation, but, rather, [were to] be judged [by the state court] in light of the whole record, including the facts of the case, the trial transcript, the exhibits, and the applicable substantive law." *Scarpa v. DuBois*, 38 F.3d at 15. *See Matthews v. Rakiey*, 54 F.3d at 911.

In applying *Strickland* and its Massachusetts counterpart, *Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974), in the case at bar, the Appeals Court stated:

> **Ineffective assistance of counsel**. The [petioner's] claim of ineffective assistance of counsel is also of no avail. The judge found the [petitioner] had failed to show that his counsel's performance, prior to and during the trial, fell measurably below that which is expected of an ordinary fallible lawyer or that he was deprived of a substantial defense. *See Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974). There was no error. The judge's findings listed a number of reasons why the [petitioner] was not prejudiced by his counsel's decisions and why those decisions were not manifestly unreasonable. Thus, the [petitioner] has failed to show that "better work [from his counsel] might have accomplished something material for the defense." *Commonwealth v. Satterfield*, 373 Mass. 109, 115, 364 N.E.2d 1260 (1977).

*Commonwealth v. Patnod*, 57 Mass. App. Ct. at 1110. (Supp. Ans. Exh. 5 at 4).

The motion judge who denied the petitioner's motion for a new trial concluded that the petitioner had failed to carry his burden of proving his claim of constitutionally

32

ineffective counsel under the *Strickland/Saferian* standard.   (Supp. Ans. Exh. 2 at A. 00531-532.)   The judge made findings on each claim asserted by the petitioner.   (Supp. Ans. Exh. 2 at A. 00530-00532).

Regarding the failure to obtain the criminal records of prosecution witnesses, the judge noted that the jury was aware that prosecution witnesses,  Susan Chaffee and Cheryl Watkins,  had criminal records through their testimony at trial.  (Supp. Ans. Exh. 2 at A. 00531).  Ms. Chaffee admitted *inter alia* that she was a heroin addict and had pleaded guilty to possession with intent on the day before the petitioner's trial.   Ms. Watkins admitted that she was working as a prostitute at the time she observed the petitioner and had three prior convictions for prostitution.  To impeach er further with trespassing and disturbing the peace convictions would have achieved negligible results, according to the judge. (Supp. Ans. Exh. 2 at A. 00531).   Both witnesses were cross-examined on their criminal backgrounds and their credibility assessed by the jury.  Cross-examination is the greatest legal engine ever invented for discovering the truth. *California v. Green*, 399 U.S. 149, 158 (1970).

Regarding the failure to obtain the victim's medical records, the judge found that the victim admitted at trial that he was taking prescription medication, Narvane and Lithium, for confusion and for a bi-polar disorder.  The judge stated: "Given these diagnoses or conditions, further exploration, through records or witnesses and expert testimony, might well have shown that the victim was a more credible witness having taken his medication than if had he not." (Supp. Ans. Exh. 2 at A. 00531).   The judge concluded that it was entirely speculative that a more scientific approach would have gained the

33

petitioner any more than was actually gained in cross-examination of the victim.  (Supp. Ans. Exh. 2 at A. 00531).

Regarding the non-attendance of the petitioner's brother, Dwayne,  at trial, the judge found that there was no evidence that service would have been successfully obtained.  (Supp. Ans. Exh. 2 at A. 00531).   He also noted that there was potential that Dwayne would claim his 5th Amendment right not to testify which he would not have been allowed to do before the jury.  Even if he was present, the physical similarity of the two brothers likely would have strengthened the Commonwealth's case and provided the jury with greater reason to credit the photo array identification of Mr. Archibald and Ms. Watkins. In any event, whether or not to call a witness is a strategic decision of counsel which is not ineffective constitutionally unless  manifestly unreasonable. *See Commonwealth v. Adams*, 374 Mass. 722, 728 (1978).

Although counsel failed to obtain an official transcript of the probable cause hearing in District Court, trial counsel was permitted to use the uncertified transcript.  He also had an audiotape of the hearing and could have used it to impeach Ms. Watkins. The judge found the inconsistencies that could have been exploited "insignificant."  (Supp. Ans. Exh. 2 at A. 00531).

Filing a motion for a required finding of not guilty would have been  futile in light of the eyewitness identifications, according to the judge.  To mandate filing such motion merely to preserve or protect the record would elevate form over substance and the judge disdained such an empty gesture. (Supp. Ans. Exh. 2 at A. 00531).

34

Finally the judge found that the probable cause procedures which the petitioner now claims should have been employed was discretionary with both his counsel and his court, i.e., being seated among a large audience in ordinary attire.  "It is speculative to say whether it would have made any difference. Moreover had the witnesses successfully identified the petitioner given these procedures their trial identification testimony would likely have been enhanced by the introduction of that procedure into evidence."  (Supp. Ans. Exh. 2 at A. 00531).

In light of the judge's  findings, the petitioner has failed to carry his burden of proving that counsel's performance was outside the wide range of professionally competent assistance and that the outcome of trial would have been different absent these alleged omissions.   The state court's adjudication of the ineffective assistance of counsel claim comported with *Strickland* and its decision was by no means objectively unreasonable under Supreme Court law.

## IV.    GROUND FOUR RAISES ISSUES PURELY OF STATE LAW WHICH ARE INAPPROPRIATE FOR FEDERAL HABEAS CORPUS REVIEW.

In Ground Four the petitioner alleges that he was denied access to materials sought in post-trial discovery, i.e, the Commonwealth's files regarding the criminal charges against Ms. Chaffee and her co-defendant Rolland Gallant relevant to Ground One. (Petition, p. 6, ¶ 12D).  In rejecting this argument, the Appeals Court stated:

> Prior to filing his motion, the defendant, pursuant to  Mass.R.Crim.P.
> 30(c)(4), 435 Mass. 1502 (2001), filed a discovery request to obtain criminal files on
> himself, Susan Chaffee, and Gallant.  The judge's denial of the [petitioner] 's
> request was not an abuse of discretion.  Under Mass.R.Crim.P. 30(c)(4) the

35

[petitioner] was required, by affidavit, to make a prima facie showing of the alleged basis for relief. The [petitioner] did not make such a showing.

His argument that the Commonwealth had access to the Committee for Public Counsel Services' (CPCS) files on Susan Chaffee is of no avail. Though the Commonwealth moved for discovery of CPCS's files related to Susan Chaffee, the judge never ruled on its motion. Instead, the record reveals that Chaffee, after consulting with counsel, signed a release allowing the Commonwealth limited access to her file. The Commonwealth also agreed to provide a copy to the [petitioner] of whatever files Chaffee released. Chaffee's release disposed of, by default, the Commonwealth's motion.

The [petitioner]'s motion for further discovery, filed at the same time as the Commonwealth's motion, was more expansive and sought discovery concerning Susan Chaffee, as well as her codefendant, Gallant, and the [petitioner] himself. The record indicates defense counsel stated at the hearing that the judge's order could be limited to materials relevant to the existence of an agreement between the Commonwealth and Susan Chaffee. Upon the judge's request, the Commonwealth represented to the judge that its files on Susan Chaffee, Gallant, and the [petitioner] contained no talks of a plea agreement with Susan Chaffee, aside from talks described in a note previously provided to the [petitioner] indicating that the Commonwealth had assented to Chaffee's motion to revise and revoke her sentence from a six to ten year committed sentence to a six to ten year suspended sentence. The Commonwealth also represented that Gallant's file had nothing to do with the [petitioner]'s case (the cases were tried separately and with different counsel) and gave the judge permission to review all of the requested files in camera to see if there was any agreement. The record also reveals that defense counsel was provided with extensive pretrial discovery material. The judge denied the [petitioner]'s motion without reasons. We conclude that the judge's denial of the [petitioner]'s discovery request was not improper. (Citations omitted.)

*Commonwealth v. Patnod,* 57 Mass. App. Ct. at 1110 (Supp. Ans. Exh. 5 at 4).

There was no abuse of discretion stemming from the denial of the discovery motion, much less a violation of federally guaranteed constitutional rights. The petitioner is essentially recasting his claims from Ground One that his rights to a fair trial, due process of law and confrontation and cross-examination of witnesses were violated by alleged agreements between the Commonwealth and two witnesses. Two judges as well as the

36

Massachusetts Appeals Court and Supreme Judicial Court have found as fact that there were no such agreements and rejected the petitioner's basic premise. *See infra.*  The petitioner new tack in Ground Four challenges the denial of a post-trial discovery motion for the Commonwealth's files in three cases.  Defense counsel later modified this discovery request to materials relevant to the existence of an alleged agreement with Ms. Chaffee which the prosecutor denied ever existed at the discovery hearing and later at the evidentiary hearing on the motion for a new trial.  (Supp. Ans. Exh. 3 at 46-50).  There was nothing to discover on the Chaffee matter.

As the Commonwealth argued in its brief, the petitioner never established a prima facie case on his motion for a new trial and was not entitled to discovery under state law. "Discovery in the context of a new trial motion is not a matter of right. The motion must first establish a prima facie case for relief before discovery is available."  Reporter's Notes on Mass. R. Crim. P.  Rule 30 (c)(3).  The Appeals Court concluded that the judge's action was not improper and no abuse of discretion occurred under state law and precedent. *Commonwealth v. Patnod,* 57 Mass. App. Ct. at 1110 (Supp. Ans. Exh. 5 at 4-5).

Errors of state law do not provide a basis for federal habeas corpus relief.  *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  It is not the province of a federal habeas court to reexamine state court determinations of state law questions.  *Lewis*, 497 U.S. at 780-81.  In other words, a habeas court lacks jurisdiction in a federal collateral attack of the petitioner's state conviction to review a claimed error of a State law.  A federal court may issue a writ of habeas corpus only when a conviction violates the constitution, laws or treaties of the United States.  *Estelle*, 502 U.S. at 67-68; 28

U.S.C. §§2241, 2254. "Even if an error of state law could be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment," a federal court may not issue a writ to redress such a deprivation if the claims are merely ancillary to perceived errors of state law. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). *See Adelson v. DiPaola*, 131 F.3d 259, 262 n. 3 (1st Cir. 1997); *Hamm v. Latessa,* 72 F.3d 947 (1st Cir. 1995), *cert. denied*, 519 U.S. 947 (1996). *See also Pitts v. Lockart*, 911 F.2d 109, 111-12 (8th Cir. 1990), *cert. denied*, 501 U.S. 1253 (1991) (petitioner's claims that he was deprived of due process and equal protection were not grounds for habeas relief where his conviction was obtained in contravention of state law, no matter how "serious and fundamental the error" may have been). Here the Appeals Court found that the judge's decision to deny discovery in these circumstances complied with prevailing state law and their adjudication is not amenable to habeas review.

Moreover, there is no clearly established Supreme Court law elevating the right to discovery in collateral proceedings to a federal constitutional right. With one important exception, every circuit court of appeals that has addressed the issue has concluded that habeas corpus is inappropriate vehicle to challenge alleged deficiencies in a state court proceeding that was collateral to the petitioner's trial. *See, e.g., Bryant v. Maryland*, 848 F.2d 492, 493 (4th Cir.1988); *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir.), *cert. denied*, 484 U.S. 838 (1987); *Kirby v. Dutton*, 794 F.2d 245, 247-48 (6th Cir.1986); *Mitchell v. Wyrick*, 727 F.2d 773, 774 (8th Cir.) (*per curiam*), *cert. denied*, 469 U.S. 823 (1984); *Williams v. Missouri*, 640 F.2d 140, 143-44 (8th Cir.), *cert. denied*, 451 U.S. 990 (1981); *United States ex rel. Curtis v. Illinois,* 521 F.2d 717, 721 (7th Cir.), *cert. denied*, 423 U.S. 1023 (1975). *But*

38

*cf. Dickerson v. Walsh*, 750 F.2d 150, 153-54 (1st Cir.1984) (holding that petitioner's equal

protection challenge to state postconviction procedures is cognizable in habeas corpus

proceeding, but dismissing the claim because of petitioner's failure to exhaust state

remedies).  *Dickerson* attacked the post-conviction procedure itself whereas the instant

case merely challenges the propriety of a state judge's discretionary ruling.  Even if

*Dickerson* is still good law, a habeas petitioner who attacks an alleged abuse of discretion

that is not of constitutional proportions made in the course of collateral proceedings is not

entitled to relief.

<u>CONCLUSION</u>

For the above-stated reasons, the petition for writ of habeas corpus should be

denied.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL
<u>/s/ Annette C. Benedetto</u>
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200
BBO No. 037060

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the Electronic Case Filing system
will be sent electronically to the registered participant as identified on the Notice of
Electronic Filing and paper copies will be sent to those indicated as non-registered
participants on the date set forth below.

Dated: November 6, 2006                    <u>/s/ Annette C. Benedetto</u>
                                           Assistant Attorney General