UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10865-GAO

MARK J. PATNOD,
Petitioner

v.

DAVID NOLAN,
Respondent

OPINION AND ORDER
October 12, 2007

O'TOOLE, D.J

The petitioner, Mark Patnod, is a prisoner in the custody of the Commonwealth of

Massachusetts, serving sentences imposed upon his conviction in 1990 of multiple offenses,

including armed robbery and assault with intent to murder. He had filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  The respondent, answering, opposes the petition, and has filed

relevant portions of the state court record.

I.      **Proceedings before the State Courts**

A.      Summary of the Facts

The following summary of the events underlying the petitioner's prosecution is from the

opinion of the Massachusetts Appeals Court affirming his convictions, Commonwealth v. Patnod,

No. 01-P-182, 2003 WL 549058, at *1-*2 (Mass. App. Ct. Feb. 26, 2003):

> On the evening of December 15, 1989, [Daniel Archibald, a taxi driver,] picked up
> the defendant in Weymouth, Massachusetts. The defendant, who identified himself
> as "Mark," requested Archibald to transport him to a residence in Worcester,
> Massachusetts, about an hour's trip. Apparently because of the distance, Archibald
> asked the defendant for payment in advance. As security, the defendant gave
> Archibald a gold chain and assured him he would pay him at the destination. Upon
> arrival, Archibald was directed to wait on a side street until the defendant returned.

At approximately, 2:00 A.M., Susan Chaffee was awakened by the defendant's voice yelling outside a window for her husband, Gary. After some time, Gary joined the defendant in the taxi, and the three drove to several locations in an attempt to sell jewelry. After leaving their last location, the defendant reached from the back seat, put a knife to Archibald's throat, and slid him over to the passenger's seat. Gary then got into the driver's seat and drove to a location where he and the defendant robbed Archibald. [Sheryl Reid] Watkins, who had been standing on the corner, saw the defendant with his arm around Archibald's neck, approached the car, and inquired about Archibald's welfare. The defendant indicated to her that Archibald was fine. Gary then drove to another location, where he and the defendant put Archibald in the trunk. They then discussed killing Archibald. Archibald heard the defendant state, "I'm going to kill this guy," and, "I don't want him testifying on me." The defendant then opened the trunk and cut Archibald's throat. The defendant tried to stab him again, but Archibald pushed him away and escaped.

After treatment at the hospital, Archibald was brought to the Worcester police station and was shown an array of photographs from two sets of pictures; one set contained a photo of the defendant, and one set contained a photo of Dwayne Patnod, the defendant's brother. Archibald picked out the photograph of the defendant's brother. A few days later, Archibald met Worcester police officers at the Weymouth police station. Archibald was again shown two sets of pictures from an array of photographs, and, again, one set contained the defendant's photo and the other contained a photo of the defendant's brother. Archibald immediately picked a photo of the defendant's brother and, in so many words, indicated he was certain that the person in the photo was his assailant.

A couple of months later, a Worcester police officer showed Archibald a single photograph of the defendant, and on that occasion Archibald identified the defendant as the person who had assaulted him. Patnod, 2003 WL 549058 at *1 n.1.

B.    Procedural History

Before trial, Patnod moved to suppress the identifications of him as the products of unduly suggestive procedures and to dismiss the charges on the grounds that the improper identification procedures had tainted subsequent identifications. The trial judge suppressed the single photograph identification, but not any others.

Patnod also filed pretrial discovery motions seeking, among other things, disclosure of agreements between the Commonwealth and prosecution witnesses and of any promises, rewards, or inducements given to such witnesses. The court granted the motion, and the Commonwealth did not disclose the existence of any agreements with its trial witnesses Ms. Chaffee and Ms. Watkins, or any promises made to them.

After his conviction, Patnod moved for a new trial. In conjunction with this motion, he filed various discovery motions, including a motion for discovery of records relating to Ms. Chaffee and her co-defendant in her separate criminal action, Rolland Gallant. The motion was denied. The motion judge held an evidentiary hearing on the merits of the new trial motion. A principal issue at the hearing was whether the Commonwealth had any made any agreements with its witnesses who testified against Patnod that had not been disclosed. The motion judge denied the motion, making written findings that no agreements or promises had been made.

Patnod's appeal from the denial of the new trial motion was consolidated with his direct appeal of his conviction.  After his conviction and the denial of his motion for a new trial were affirmed, he filed an application for further appellate review by the Supreme Judicial Court, which application was denied without opinion.

## II.    Merits of the Habeas Petition

### A.    Summary of Grounds Presented

The petitioner presents four grounds for the issuance of a writ of habeas corpus. First, he contends that the prosecution failed to disclose exculpatory evidence by failing to disclose agreements with and/or promises made to Ms. Chaffee and Ms. Watkins. Second, he argues that his convictions were based on unduly suggestive identification procedures. Third, he asserts that the

performance of his counsel at a probable cause hearing and at trial amounted to ineffective assistance of counsel. Finally, he contends that he was wrongly denied post-trial discovery. In each respect, he contends that the error was of constitutional significance.

B.    Standard of Review

A writ of habeas corpus shall not be granted, as to a claim that has been adjudicated on the merits in state court proceedings, unless the petitioner shows either that the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Id. § 2254(d)(2).

A decision may be "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "[i]f the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., Opinion of the Court). An "unreasonable application" of Supreme Court precedent occurs if a state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. Id. at 407. An unreasonable application of Supreme Court precedent is one that is objectively unreasonable, as distinct from one that is merely incorrect. Id. at 410. The First Circuit has explained that "[s]ome increment of incorrectness beyond error is required." McCambridge v. Hall, 303 F.3d 24, 36 (1st. Cir. 2002) (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)). The degree

of incorrectness "must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." Id. As to whether an adjudication was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," findings of fact by a state court are presumed correct, and the burden is on the petitioner to rebut this presumption by clear and convincing evidence. Id. § 2254(e)(1). Facts are defined as "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir. 1999)).

C.      Ground One: Undisclosed Agreements and Prosecutorial Misconduct

Whether there were any undisclosed agreements that existed between the Commonwealth and prosecution witnesses Ms. Chaffee and Ms. Watkins is a question of historical fact. The motion judge's findings of fact as to this issue, and the Appeals Court's subsequent affirmation, must be presumed correct by this Court on habeas review unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1). The petitioner has not made such a rebuttal.

The facts, as found by the motion judge, were as follows: Ms. Chaffee was facing separate criminal charges for possession of heroin with intent to distribute within a school zone, possession of heroin with intent to distribute; possession; and unlawful possession of a firearm and ammunition. The day before Patnod's trial, Ms. Chaffee entered into a plea agreement in which the Commonwealth agreed to reduce the school zone charge to possession of heroin with intent to distribute; to dismiss the other charges; and to recommend a six to ten year committed sentence, with no mandatory minimum. This was disclosed to Patnod, and indeed defense counsel questioned Ms. Chaffee during cross-examination as to whether this plea agreement had in any way influenced or induced her testimony, to which she replied it had not.

Patnod alleges that in addition to the disclosed agreement, there was an informal or implied agreement that something more favorable to Ms. Chaffee would happen with her sentence if she identified Mark Patnod during her testimony. In her case, though the court accepted her plea agreement, it also allowed a stay of execution that was unopposed by the prosecutor, because Ms. Chaffee had a newborn baby at home who was ill and needed time to arrange for her mother to obtain temporary custody. Sometime after Patnod's trial was concluded, Ms. Chaffee's six to ten year sentence was reduced to probation on her motion without opposition from the Commonwealth. Patnod points to this sequence of events as evidence that an implied agreement to reduce her sentence existed at the time she testified.  He argues that the Commonwealth's failure to disclose this agreement violated its obligation to provide him with potentially exculpatory evidence.

At the hearing on Patnod's motion for a new trial, the Commonwealth's witnesses, Ms. Chaffee, Donald Progen, (the prosecutor assigned to Ms. Chaffee's unrelated case), and Thomas Landry (the prosecutor at Patnod's trial) all testified that there was no undisclosed agreement, express or implied, between the Commonwealth and Ms. Chaffee. Ms. Chaffee's counsel, Maria Scozzafava, and Gary Chaffee both gave testimony that would have supported an inference that there was such an agreement. As there was conflicting testimony from these witnesses, the motion judge's finding that there had been no undisclosed agreement rested on his judgment of the credibility of the witnesses. The judge concluded that "[w]hen Chaffee testified against Patnod, she did so without there having been any agreement with the Commonwealth that her sentence would be anything other than that previously recommended, namely, the 6 to 10 years in prison. There was nothing said by the Commonwealth's representatives that could form the basis of any implication of any agreement." (Supp. Ans. Ex. 2 at 00525.) The motion judge stated that "[t]o the extent that any other witness testified that there was any expectation of favorable treatment of Chaffee in her

6

case as a result of her testimony against Patnod, they are disbelieved." (Id. at 00526.) The motion judge ultimately concluded that "there had been no promise, reward or inducement made to Susan Chaffee for her testimony. . . ." (Id. at 00527.)

The petitioner also alleges that there was an undisclosed agreement with Watkins. Watkins pled guilty to charges of possession of a Class B controlled substance and trespassing, and received a sentence amounting to time served, apparently nine days. At the hearing on the motion for a new trial, one Dwayne Burrell testified that in 1999 while he and Patnod were both incarcerated in the same unit at MCI Cedar Junction, Patnod mentioned his brother Dwayne's name, which revived Burrell's memory of a conversation he had previously had with Watkins in the spring of 1996. Burrell testified that Watkins, upon learning that Burrell's first name was Dwayne, told him about an agreement she had made years before with the Commonwealth whereby, in exchange for avoiding jail time on charges pending against her, she had to identify Mark Patnod at his trial, even though she had previously identified his brother Dwayne as the perpetrator and knew that Mark had not committed the crime. The motion judge stated that "the testimony from Burrell is not believed. There is no credible basis to conclude, therefore, that there was any promise, reward or inducement made to Sheryl Reid Watkins in consideration for her testimony against Patnod . . . ." (Id. at 00528).

The Appeals Court affirmed the motion judge's findings of fact. Patnod, 2003 WL 549058 at *2. The Court found that, as to Ms. Chaffee, that the motion judge's ruling that no undisclosed agreement existed was "sufficiently supported by the evidence," and involved "[t]he judge's assessment of the witnesses' credibility" which "was obviously based on many factors." Id. The Court noted that "[t]he mere fact that Susan Chaffee's six to ten year sentence was reduced to a probationary term does not, as the defendant suggests, necessarily lead to the conclusion that there was an agreement for her testimony." Id. As to Watkins, the Court noted that the motion judge stated

7

that he did not believe Burrell's testimony, and held that "[t]he judge is the final arbiter of matters of credibility" and "there was sufficient evidence to support the judge's findings . . . ." Id.

Under 28 U.S.C. § 2254(e)(1), these findings of fact must be presumed to be correct unless the petitioner has rebutted them with clear and convincing evidence. Viewing the record in its entirety, there is ample evidence to support the state courts' findings of fact that no undisclosed agreements existed with either of the witnesses. Although circumstantial evidence exists that *could support* an inference that such an agreement existed, the evidence certainly does not *require* such an inference. The question ultimately boils down to the credibility of witnesses. The motion judge had the responsibility to decide whether to believe or disbelieve the testimony of any of the witnesses, and importantly he had the opportunity to observe those witnesses first-hand to assess all of the many factors that weigh on credibility. The Appeal's Court explicitly recognized this in affirming the motion judges' findings. See Patnod, 2003 WL 549058 at *2. Accordingly, since the petitioner has not rebutted these findings of fact with clear and convincing evidence, the state courts' findings that no undisclosed agreements with Watkins or Chaffee existed is presumed correct.

The petitioner argues that the Commonwealth withheld material exculpatory evidence from Mr. Patnod and thereby deprived him of his right to due process under the Fifth and Fourteenth Amendments, and of his right to a fair trial and right to confront the witnesses against him under the Sixth Amendment. The petitioner also asserts that the state courts erred in rejecting his claims that the prosecutor knowingly failed to correct the false impression created by Ms. Chaffee's testimony (which admitted the express agreement to plead guilty and receive a six to ten year sentence but denied the existence of any implied agreement), and that the prosecutor committed misconduct by mentioning the severity of Ms. Chaffee's sentence in closing arguments in order to bolster her credibility. These claims depend entirely on the existence of an undisclosed agreement. Since none

existed, the state courts' application of the law is not contrary to, or an unreasonable application of, clearly established Supreme Court law because there is no right to the disclosure of exculpatory evidence that does not exist, and no requirement for the prosecutor to correct or refrain from using a statement by a witness that is not false. See 28 U.S.C. § 2254(d)(1).

D.      Identification Procedures

The petitioner also claims that the identifications of him by Archibald and Watkins were impermissibly tainted by unduly suggestive procedures which violated his rights to due process, a fair trial, and confrontation and cross-examination under the Fifth, Sixth, and Fourteenth Amendments. The petitioner asserts that the suggestive display of a single photograph of Patnod to Archibald, and the circumstances under which Archibald and Watkins viewed Patnod at the probable cause hearing were so suggestive as to taint the subsequent in-court identifications. The state courts found that Archibald and Watkins each had an independent source for their identifications of Patnod. See Patnod, 2003 WL 549058 at *3-4.

The judge at the suppression hearing found that all of the identifications, except the one that Archibald made from the single photograph, were based on observations on the night of the incident. The judge stated that "[s]o far as the procedure that was used by the police on all occasions, other than the showing to the taxicab driver of the single photograph, I find nothing that was unduly suggestive or suggested at all on the part of the police in the demonstrations made with either of the witnesses." (Supp. Ans. Ex. 1 at Add.-29.) As to the probable cause hearing, the judge found that both Archibald and Watkins observed and immediately identified the defendant when he entered the courtroom, about "forty feet" away from Archibald, and also "at some distance from" Watkins (Id. at Add.-29) and also found that:

9

> [F]rom the evidence it appears that the identification of the two witnesses were that they were spontaneous and at the time they were made the defendant was not particularly singled out in any fashion. It does appear that at some time later in that hearing he must have been placed in a location where he would have been singled out, because he was immediately adjacent to the witness while the witness was testifying. But that is not the time when each of the witnesses made their identifications.

(Id. at Add-32.) The judge excluded only the single photo identification, found that the subsequent identifications were not tainted, and both Archibald and Watkins were allowed to identify Patnod at trial.

The judge ruling on Patnod's motion for a new trial agreed, finding that there was "no basis to conclude that the ultimate ruling of the motion judge was improperly decided." (Supp. Ans. Ex. 2 at 00529.) This was affirmed by the Appeals Court, which found that Archibald "had numerous opportunities to view the defendant on the night of the incident," spent a significant amount of time driving Patnod around, and had "paid particular attention to the defendant in the back seat of the taxi because of the defendant's conduct." Patnod, 2003 WL 549058 at *3. Archibald also had an opportunity to view his assailant when he was being attacked, and Watkins had ample time to observe Patnod, "given her heightened concern for the person in the passenger seat with an arm around his throat when she approached the vehicle from the passenger's side to inquire about Archibald's welfare." Id. at 3-4. Therefore, "the suppressed single photo identification did not taint the subsequent in-court identifications . . . ." Id.

The petitioner argues that the state courts' analysis was unreasonable because the judge ignored the facts: (1) that Archibald's initial description of the perpetrator matched Dwayne and not Mark; (2) that Archibald identified Dwayne from a photo array shown to him within twenty-four hours of the crime; (3) that the photo array in which Archibald identified Dwayne also included a photo of Mark, which Archibald passed over; (4) that Watkins also identified Dwayne's photograph;

and (5) that "the judge's conclusion was based in part on an improper physiognomic disquisition of his own," because "he opined that the 'bone structure' of Mark's and Dwayne's faces, the shapes of their heads and noses, and the quality of their eyes were 'remarkably similar,' when there was no showing that the judge was an expert in this subject or that it was a matter of which he could take judicial notice." (Mem. of Law Supp. Pet. Mark J. Patnod Post-Conviction Relief Pursuant to 28 U.S.C. §§ 2241 and 2254, 38-39 [hereinafter Pet.'s Mem.].) The petitioner argues that all subsequent identifications are "fruits of the poisonous tree," tainted by the occurrences that preceded them, and that the state courts' analysis based on the ample time for observation on the night of the incident "might hold up *if*" Archibald had identified Mark from the initial photo arrays, but in the case is unsupportable because Archibald did not identify Patnod until after he viewed the suggestive single photograph. (Id. at 39.)

To succeed on this issue, the petitioner must show that the independent source analysis was contrary to, or an unreasonable application of, clearly established Supreme Court law, or an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). In Simmons v. United States, 390 U.S. 377, 384-85 (1968) the Court set out a two-part test for the exclusion of identifications based upon impermissibly suggestive photo arrays. First, the court must determine whether "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" Id. at 384. If so, then the court must assess the "whether under the totality of the circumstances the identification was reliable even though the...procedure was suggestive," which includes such factors as "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness...and the length of time between the crime and the [identification]." Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

The result reached by the state courts was not contrary to, nor did it involve an unreasonable application of these principles. Precedent permits an in-court identification to be made even when it is preceded by an impermissibly suggestive identification procedure if, under the totality of the circumstances, the identification is reliable. See id. Contrary to petitioner's claims, the state courts did consider that the description of the assailant that Archibald gave to the police in the hospital the day after the incident, and that both Archibald and Watkins initially identified Dwayne as the perpetrator when shown a photo arrays which also included Mark (Supp. Ans. Ex. 1 at Add.-21-23.) As to the judge's conclusion that the two brothers "have a remarkably similar appearance," whether they looked alike is simply one of the many factors in the totality of the circumstances that the judge had to consider, and was in no way improper. If the photographs were remarkably dissimilar, for example, there might be stronger reason to infer that later identifications were in fact tainted by the suggestive single-photo identification, because the person later identified looked so different from the one first identified.  By the same token, if the images are very similar, identification first of one and then of the other may be due to other factors than suggestion. For present purposes, the key point is that the state courts paid attention to the petitioner's claim, held hearings, and came to reasoned judgments on the basis of the information presented.  Their conclusion that, considering the totality of the circumstances, the subsequent identifications were sufficiently reliable to be admitted was an entirely reasonable one. And, of course, once they were admitted in evidence, judgment as to their probative value or force was a matter for the jury.

E.    Ineffective Assistance of Counsel

The petitioner also bases his application for habeas relief on his assertion that he was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments. The petitioner claims that the conduct of his attorney at the probable cause hearing was incompetent and resulted in prejudice. He claims that his counsel at the probable cause hearing erred by failing to take

steps to prevent the witnesses from seeing him in suggestive circumstances. (Pet.'s Mem. at 41-42.) He claims that his trial counsel (1) failed to obtain the criminal records of prosecution witnesses; (2) failed to obtain Archibald's medical records or otherwise to develop the facts regarding Archibald's manic depressive illness and medication; (3) failed to make any attempt to compel Dwayne Patnod to appear at trial; (4) failed to obtain an official transcript of the probable cause hearing; (5) failed to seek a required finding of not guilty; and (6) failed to object to "unsupported assertions" made by the prosecutor about one of the petitioner's alibi witnesses during closing arguments and "to his unfair cross-examination of Mr. Chaffee." (Id.)

The judge hearing Patnod's motion for a new trial rejected his claim of ineffective assistance of counsel. (Supp. Ans. Ex. 2 at 00529-32.) As to failing to procure the prosecution witnesses' criminal records, he found that Ms. Chaffee admitted during trial that she was a heroin addict, that she had just pled guilty to criminal charges for which she would receive a prison sentence, and that some of the charges had been dismissed because of her plea agreement. (Id. at 12). The judge found that "[t]o impeach her further would have gained little, if anything." (Id.) The same went for Watkins, who had admitted that she was working as a prostitute when she made her observations of Patnod, and that she had been convicted three times for prostitution. (Id.)

The judge also found that Archibald's medical records would have been equally likely to have bolstered his credibility as they would have been to impeach it by showing he was taking his required medication on the night in question. (See id.) As to Dwayne Patnod, the judge found that "there is no evidence that service would have been successfully obtained," and that given Dwayne's Fifth Amendment rights, the most Patnod would have gained by Dwayne's presence would have been the jury being able to see the physical similarity or differences between the two brothers. (See id.) The judge found the failure to obtain a certified transcript of the probable cause hearing was insignificant, because he was permitted to use the uncertified transcript and also had an audiotape

of the hearing. (Id. at 00532.) The judge found that "[g]iven the eyewitness identifications by Archibald and Watkins, a motion for a required finding of not guilty would have been futile . . . " and that the complaints as to the prosecutors closing statement were unfounded. (Id.) The judge found that the identification procedure at the probable cause hearing was "discretionary with both his counsel and the court," and that it would be "speculative to say whether it would have made any difference," if counsel had employed any other procedure. (Id.)

The Appeal's Court affirmed this in all respects, holding that Patnod "failed to show that better work from his counsel might have accomplished something material for the defense." See Patnod, 2003 WL 549058 at *4 (internal quotations omitted).

To prevail on an ineffective assistance of counsel claim, the petitioner must show that "counsel's representation was unreasonable under prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984).

The right to effective assistance of counsel is not a guarantee of a perfect, or even a successful defense. See United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). The state courts were correct in their rejection of the petitioner's claim that he did not receive the effective assistance of counsel. In any event, the resolution of this issue by the state courts was not contrary to, or an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Id. § 2254(d).

F.    Discovery of the Commonwealth's Files

Lastly, the petitioner argues that the state courts' failure to require the Commonwealth to permit discovery of its files in Mr. Patnod's, Ms. Chaffee's, and Mr. Gallant's cases violated the Fifth, Sixth, and Fourteenth Amendments. (Pet.'s Mem. at 43.) The state courts found that, in order

to obtain the requested files, Mass. R. Crim. P. 30(c)(4) required Patnod to make a prima facie showing of the alleged basis for relief by affidavit, which he did not. See Patnod, 2003 WL 549058 at *4.

As discussed above, the state courts' finding of fact that there was no undisclosed agreement between the Commonwealth and the prosecution witnesses is presumed to be correct unless it is shown to be otherwise by clear and convincing evidence, and the petitioner has not met that standard. If the finding is left undisturbed that there was no agreement, then compelling a discovery response would have been fruitless, and no federal Constitutional rights implicated. All that could possible remain would be an argument that the state courts misapplied state law. Errors of state law do not provide a basis for federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

## III.    Conclusion

For all the foregoing reasons, the petitioner has not shown that the state courts' adjudication of any of his claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or that the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Id. § 2254(d)(2). He is not entitled to a writ of habeas corpus, and his petition is therefore DENIED.

It is SO ORDERED.

        /s/ George A. O'Toole, Jr.
        United States District Judge